**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

| | |
|---|---|
| **ALBERT S. SMYTH CO., INC.;** ~~SMYTH ELLICOTT CITY, LLC; SMYTH ANNAPOLIS, LLC, SMYTH MANAGEMENT SERVICES, LLC; SMYTH ENTERPRISES LLC and THEDIAMONDSTORE.COM, LLC~~*et al.* | **IN THE** |
| ~~2020 York Road~~ | |
| ~~Timonium, Maryland 21093~~ | **CIRCUIT COURT** |
| | **FOR** |
| *Plaintiffs* | **BALTIMORE COUNTY** |
| **v.** | |
| **MARK A. MOTES** | |
| ~~1376 SE Colony Way~~ | **CASE NO:** 1:17-cv-00677-CCB |
| ~~Jupiter, Florida 33478~~ | |
| ~~*Defendant*~~ | |
| and | |
| JOHN JACKSON III 2016 Twin Lakes Drive Jarrettsville, MD 21084 | |
| and | |
| MERITAGE FINE JEWELERS LLC 2016 Twin Lakes Drive Jarrettsville, MD 21084 | |
| SERVE ON: Robert D. Kalinoski 602 Harvest Court | |

*Bel Air, MD 21014*
*Resident Agent*

*Defendants*

## PLAINTIFFS' THIRD AMENDED **COMPLAINT**

Plaintiffs Albert S. Smyth Co., Inc~~.;~~, Smyth Ellicott City, LLC~~;~~, Smyth Annapolis, LLC~~;~~,

Smyth Management Services, LLC~~;~~, Smyth Enterprises, LLC and

~~TheDiamondStore~~TheDiamondSupplier.com, LLC~~, plaintiffs~~, by their undersigned counsel, sue

Mark A. Motes, ~~defendant~~John Jackson III, and Meritage Fine Jewelers LLC, defendants.

### THE PARTIES

1.      Plaintiffs Albert S. Smyth Co., Inc. ("Smyth ~~Co.");~~Timonium"); Smyth Ellicott City,

LLC ("Smyth Ellicott City"); Smyth Annapolis, LLC ("Smyth Annapolis"); Smyth Management

Services, LLC ("~~Management Services~~SMS"); Smyth Enterprises, LLC ("Enterprises") and

~~TheDiamondStore~~TheDiamondSupplier.com, LLC ~~(the "Diamond Store~~("TDS") (collectively "the

Companies") are a family of related entities organized under the laws of the State of Maryland

which do or have done business within the State of Maryland.

2.      Plaintiff Smyth ~~Co., Inc.~~Timonium was founded in 1914 by Albert S. Smyth and

has continually operated in Maryland selling jewelry, wholesale diamonds and related

accessories to retail customers as well as through mail and the ~~internet~~Internet.  It also

purchases gold and other precious metals from the general public for resale to third parties.

Smyth ~~Co., Inc.~~Timonium has been continually owned by Albert S. Smyth and his descendants

since its inception.

3.      Defendant Mark A. Motes first became employed by ~~the Company~~Smyth Timonium in 1997, and gradually was promoted until he became Chief Operating Officer ~~of the Companies~~ effective January 1, 2007.

4.      Defendant John Jackson III first became employed by Smyth Timonium in 2000 and was gradually promoted until he became Vice President for Operations.

5.      Defendant Meritage Fine Jewelers LLC ("Meritage") is a Maryland Limited Liability Company formed by Defendants Mark Motes and Jackson on or about January 18, 2017 for the purpose of directly competing with Plaintiffs, and is utilizing trade secret information unlawfully obtained from Plaintiffs in furtherance of that purpose.

JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States, namely the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.*

7.      The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8.      The Court has personal jurisdiction over each of the defendants pursuant to the 5th and 14th Amendments to the Constitution in that Defendants Jackson and Meritage Fine Jewelers LLC reside in the District.  Defendant Motes, who claims to reside in the State of Florida, removed this case from the Circuit Court for Baltimore County ~~has personal jurisdiction over the Defendant pursuant to Md. Cts. & Jud. Pro. Code § 6-103(b)(1) and (3) in that he~~, and all of the

acts alleged occurred within the District.  All of the defendants regularly ~~transacts~~carry on

business ~~and performs work or services within the~~ in this district.

~~4.~~9.      Venue is proper in this Court because all defendants have minimum contacts

with the State of Maryland ~~and has caused tortious injury in the State and regularly does or solicits~~

~~business in the State and engages in a persistent course of conduct~~, all of the acts alleged in this

Amended Complaint took place within the ~~State~~District, and all defendants have purposefully

availed themselves of the protection of the forum.

~~5.      Venue is proper in Baltimore County pursuant to Md. Cts. & Jud. Pro. Code § 6-201 (a) in~~

~~that Defendant is employed, carries on a regular business, and habitually engages in a vocation within~~

~~Baltimore County.~~

~~6.~~10.      Jurisdiction and venue are also proper since Defendant Motes has, by

agreement, consented to have all actions between the parties determined in the ~~Circuit~~United

States District Court for ~~Baltimore County~~the District of Maryland.

<u>FACTS COMMON TO ALL COUNTS</u>

~~7.~~11.      Defendant ~~Mark A.~~ Motes first became employed by the ~~Company~~Smyth

Timonium in 1997, and gradually was promoted through 2007 when he became Chief Operating

Officer ~~of the Smyth Co.~~.  Up until that time, management of the Companies was in the hands of

~~Tom~~Thomas A. Smyth, ~~Bob~~Robert L. Smyth, Jr. and Leonard G. Getschel, Jr., three cousins who

are direct descendants of the founder.

~~8.~~12.      Effective January 1, 2007~~Mr.~~, Defendant Motes entered into an employment

agreement with Smyth ~~Co~~Timonium, (the "Employment Agreement"), pursuant to which

Defendant ~~became the~~was named Chief Operating Officer ~~of Smyth Co.,~~, while the three cousins remained as officers and board members.

~~9.~~13.   It was understood and agreed by all parties that ~~Defendant's~~Defendant Motes' experience and loyalty to the Companies justified placing operational control in his hands, and that Defendant Motes would be treated as a 25% partner in all the operating entities.  To that end, the Employment Agreement provided that "Executive shall receive a twenty-five percent (25%) membership interest in each such LLC formed for the purpose of operating a retail facility, and shall have such rights, duties and obligations as are set forth in the LLC Operating Agreement from time to time."

~~10.~~14.  The Employment Agreement also provided for a one-time valuation bonus ("Valuation Bonus") upon ~~Defendant's~~Defendant Motes' termination of employment for any reason.  The Valuation Bonus was implemented to allow Defendant Motes to participate in the growth in value of Smyth ~~Co.~~ as though he was a 25% partner, without ~~actually~~ granting him stock.

~~11.     Throughout the term of Defendant's employment as Chief Operating Officer, the parties discussed ways by which Defendant could become an actual stockholder, but due to issues with respect to other stockholders, lenders etc. he was never required to actually purchase stock.~~

~~12.~~15.   ~~.~~The Employment Agreement also provided ~~Mr.~~Defendant Motes with an initial base salary of $600,000 per year, increasing annually by $25,000 per year. In addition, after the ~~company's~~Companies' accountants calculated the total amount of net income, Defendant Motes was entitled to a bonus equal to the highest performance bonus payable to any other officer of the ~~Company..~~Companies.

~~13.~~16.   As agreed in the Employment Agreement, ~~Mr.~~Defendant Motes was granted 25% ownership interests in Smyth Annapolis~~, LLC~~ and Smyth Ellicott City ~~LLC~~ in 2008.

~~14.~~17.   In 2009, ~~Mr.~~Defendant Motes was given a 25% ownership interest in Smyth Enterprises~~, LLC~~, an entity which operated Pandora branded retail outlets both within and outside the state of Maryland.

~~15.~~18.   In 2011, ~~Mr.~~Defendant Motes was given a 25% ownership interest in ~~TheDiamondSupplier.com, LLC~~TDS.

~~16.~~19.   Finally, in 2012, ~~Mr.~~Defendant Motes was given a 25% ownership interest in ~~Smyth Management Services, LLC~~SMS, which managed, under a management contract, retail jewelry stores ~~traded~~trading under the name of Bailey Banks and Biddle.

~~17.~~20.   During the latter years of ~~Mr.~~Defendant Motes' employment, he convinced the Board to enter into several new business ventures that proved to be unprofitable.  One, ~~the Diamond Store~~TDS, lost more than $4.8 million in three years and was forced to close.

~~18.~~21.   ~~Mr.~~Defendant Motes misrepresented to the Board of Directors that all inventory for ~~the DiamondSupplier.com would all be~~TDS was acquired on consignment.  Defendant Motes then provided contradictory documents to ~~the Bank showing~~ Plaintiffs' lender, misrepresenting the asset inventory valued at ~~r~~$750,000 ~~for~~, with the remainder of inventory on consignment. When the stores closed in 2015, there was over $1.8 million in inventory that TDS had purchased ~~by the LLC.  This documentation was never provided to the~~ .   Defendant Motes concealed this information from the Board~~.~~ of Directors.  In other words, Defendant ~~was telling~~ Motes made varying and contradictory misrepresentations as to the valuation of the ~~bank one thing,~~TDS inventory to both the lender and the Board ~~another, and neither was true.~~of Directors.

These misrepresentations contributed to massive losses, which ~~resulted in the discontinuance of business by TheDiamondSupplier.com and a loss attributable to~~ultimately led the ~~discontinuance of $1,524,770 as of December 31, 2015~~Board of Directors to discontinue TDS' operations.  .

~~19.~~22.   The operations of Smyth Enterprises, Smyth Management and ~~the Diamond Store~~TDS were all discontinued in 2014 and 2015.

~~20.~~23.   At all times since the execution of the Employment Agreement until the termination of his employment in 2016, ~~Mr.~~Defendant Motes ~~has been~~was given all of the rights, benefits and responsibilities of Chief Operating Officer of all of the ~~Plaintiff entities.~~Companies.

24.      ~~The ~~For purposes of distributions, the parties agreed that ~~all distributions of~~ Defendant Motes would participate in the profits and losses ~~from~~of all of the operating entities~~, including the limited liability companies, were~~ as though he was the owner of a 25% interest in all of the entities, including Smyth Timonium.  .

~~21.~~25.   To accomplish the goal of treating Motes as a 25% partner in the consolidated retail operations, Motes' Employment Agreement was restructured in 2009 resulting in an agreement to freeze the valuation bonus to be ~~based~~paid upon ~~the combined net operating termination at $62,302, and to change the compensation structure to reflect that Motes would be compensated by a combination of salary and participation in the profits and losses ~~from~~of all of the ~~entities, including Smyth Co.,~~companies on a consolidated basis.

26.      The 2009 restructuring of the compensation arrangement was never reduced to writing, but for the seven years until Defendant Motes' employment ended, Smyth fully performed its obligations under the Employment Agreement as modified.

27.     As an additional part of the 2009 restructuring, it was agreed that Defendant Motes would receive distributions equal to 25% of the profit generated by the operations of Smyth Timonium in lieu of the annual bonuses provided in the Employment Agreement.

22.28.  Each year, beginning in 2008, the year that the first two LLCs were created, the Companies' independent public accounting firm prepared ~~reviewed consolidated financial statements, which were shared~~an Independent Accountants Review Report.  A review, in accordance with the Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Accountants, requires the accountants preparing the report to apply analytical procedures to financial data supplied by management and ~~shareholders of the Companies, including Defendant, and were presented to the Companies' bank in support of its lending/credit relationship~~to make inquiries of management.

29.     ~~The accountants noted that in the consolidation of the Companies,~~Defendants Motes and Jackson were the management personnel principally responsible for communicating with the accountants and responding to the accountants' inquiries.  As part of each of the annual Review Report, the accountants prepared a schedule entitled 'Notes to Consolidated Financial Statement.'

30.     Each year, the Notes to Consolidated Financial Statement disclosed that "All intercompany balances and transactions ~~were~~have been eliminated~~, meaning for example, that~~ in consolidation."  As a result, overhead and management expenses, including ~~Defendant's salary,~~the salaries of Defendants Mark Motes and Jackson were not allocated to the affiliated entities, ~~even though services were being provided to those~~ but rather were carried on the books of

Smyth Timonium.  This created intercompany balances, which were adjusted for in the preparation of each years' consolidated financial statement.

23.31.   Because Motes was entitled to receive 25% of the profits and losses of the operating entities.  This meant that Defendant ignored as a whole, for compensation and financial reporting purposes, it did not make any difference which entity was being charged with expenses that otherwise would have reduced the profits available for distribution to the LLC members when Defendant took distributions for himself from those LLCs based upon artificially inflated earnings, as moving those expenses from one entity to another would raise profits in one entity while lowering profits in the other in an equal amount.

24.      After the expiration of the initial term of the Employment Agreement, the parties agreed to extend the terms of the Employment Agreement.  As required by the Employment Agreement, Mr. Motes continued to receive the 25% interest in operating LLCs formed after December 31, 2010 and Mr. Motes continued to receive the agreed compensation increases throughout his employment.  Capital necessary to fund the new entities was provided by the Albert S. Smyth Co., without contribution by Defendant.

32.      As Chief Operating Officer, Mr.Defendant Motes directed the accounting department to issue checks to himself from the LLCs and from Smyth Co. Mr..  Most of these checks were signed by Defendant Jackson.

25.33.   Both Defendant Jackson and Defendant Motes also had signature authority for the companyCompanies' checking accounts.  As such, heEach was a fiduciary to the Companies.

26.34.   Once the limited liability companies operating LLCs were established, Mr.Defendant Motes began spending more and more time focusing his efforts on those entities, rather than on the operation of the Timonium flagship store, which is owned by the Albert S.

~~Smyth Co., Inc.~~ As a direct result, the Timonium store began losing money in 2013, which losses continued until Mr. Motes' termination in 2016.

~~27.~~35.   For the three years between 2013 and 2015, the Timonium operation lost nearly $5,000,000.  As a result, Branch Banking and Trust Company ~~terminated the Company's,~~ Smyth's long-time lender, notified Smyth that it was terminating the Companies' banking relationship and ~~its~~ credit lines ~~were revoked~~.

~~28.     During the existence of the operating LLCs, Defendant drew out his 25% share of the net cash flow of those entities, but none of the other members drew their share of net cash flow.~~

~~29.     Between 2014 and 2016, family members injected $3,000,000 into the business while at the same time Defendant withdrew $2,826,100 from the LLCs.~~

~~30.~~36.   In 2016, the ~~Company~~Companies refinanced ~~its~~their indebtedness with the Columbia Bank.  As a condition of the refinancing, family members were required to inject even more capital into the business.  ~~Mr.~~Defendant Motes did not contribute any capital.

~~31.~~37.   On July 26, 2016, The Columbia Bank and the Albert S. Smyth Co., Inc. entered into a $10,000,000 line of credit (the "Line of Credit").  At the same time, Smyth Realty York Road, LLC, which owns the real estate on which the Timonium store operates, refinanced the Timonium property through a $10,250,000 term loan (the "Term Loan").  Both loans were guaranteed by Smyth Annapolis LLC and Smyth Ellicott City LLC, along with all affiliates, and were personally guaranteed by Thomas ~~A.~~ Smyth, Robert ~~L.~~ Smyth, Jr. and Leonard ~~G.~~ Getschel, Jr. Defendant Motes did not guarantee either the Line of Credit or the Term Loan.

~~32.     Defendant Motes did not guarantee either the Line~~For each of ~~Credit or the Term Loan.~~

10

33.   For the years 2013 through 2015, Mr. Defendant Motes took equity draws totaling $962,553, $925,727 and $937,820, respectively, from the LLCs. operating the Annapolis and Ellicott City stores.  In calculating his draws, he took profits out of the companies that Smyth Annapolis and Smyth Ellicott City (which were making money, on paper, profitable, but in actuality were being subsidized by the Timonium store), but did not offset those profits with the losses sustained by other companies.  Thus, during the years 2013 through 2015 Mr. Motes overpaid himself at least $784,497, solely from the LLCs.

34.   At the same time, Mr. Motes was drawing funds from Smyth Annapolis and Smyth Ellicott City, his share of the losses from the Timonium operation should have been used to offset the moneys he overdrew from the Annapolis and Ellicott City stores.

35. 38.   Upon the termination of Mr. Motes' employment by the Company, he was entitled to a one-time valuation bonus based upon the increase in net worth of the consolidated operations of the Albert S. Smyth Company, Inc., Smyth Annapolis, LLC and Smyth Ellicott City, LLC.  This bonus was to be based upon the weighted average for the prior four years of the capitalized gross profit and the capitalized adjusted net income from the three remaining operating entities. Timonium or TDS.

39.   During those three years, the Independent Accountants' Review Reports showed, on a consolidated basis, the Smyth entities earned $1,209,588 in 2013, $388,626 in 2014 and *actually lost* $251,621 in 2015.  As a result, Motes' 25% share of the profits for those three years should have been $336,648 rather than the combined $2,826,100 that he paid himself.  During the same time period, Smyth family members injected approximately $ 3,000,000 into the business to retain adequate capitalization.

40.   Intercompany transactions are transactions that happen between two entities of the same company.  When preparing profit and loss statements for related companies,

intercompany transactions must not be shown as profits or losses for the individual companies. Accordingly, not adjusting intercompany transactions results in consolidated financial statements that do not offer a true and fair view of the group's financial situation. Intercompany eliminations are made to remove the profit/loss arising from intercompany transactions. No intercompany receivables, payables, investments, capital, revenue, cost of sales, or profits and losses are recognized in consolidated financial statements until they are realized through a transaction with an unrelated party.

41.     Defendants Motes and Jackson ignored the intercompany eliminations shown on the financial statements, and paid Motes based only upon the profit shown before intercompany eliminations.  The effect of ignoring the intercompany eliminations was to artificially inflate the profitability of Smyth Annapolis and Smyth Ellicott City by shifting overhead to Smyth Timonium which resulted in massive overpayments.  Defendants Motes and Jackson knew, at the time they were distributing these funds, that they were not making distributions based upon the actual profitability of Smyth Annapolis and Smyth Ellicott City.

42.     Defendants Motes and Jackson knew at the time of taking the Smyth Annapolis and Smyth Ellicott City distributions that allocations of certain major expenses should have been made so as to accurately reflect the true profitability of the subsidiary entities.

43.     In early 2016, Smyth's Board of Directors was considering formally merging Smyth Annapolis LLC, Smyth Ellicott City LLC, and Albert S. Smyth Co., Inc. into a single entity. This was contemplated to formalize the manner in which the companies had been operating for many years, and the manner in which the Companies' accountants had been preparing their tax

returns and financial statements.  In other words, the companies were formalizing what had been the de facto reality for many years.

44.     Defendant Motes owned an actual 25% interest in both Smyth Annapolis LLC and Smyth Ellicott City LLC, but only had an equitable ownership interest in the Albert S. Smyth Co., Inc.

~~36.~~     In order to adjust the equities of the parties, it was necessary to account for the losses and negative equity in Albert S. Smyth Co., Inc. ~~Capitalized gross profit was to be calculated based upon the sales as reported in the Company's annual financial statements multiplied by capitalization factor of 1.25.~~

~~37.     Capitalized adjusted net income was to be calculated based upon the net income of the entities as reported in their annual financial statements adjusted to eliminate the effect of total officers' compensation, and then multiplying by a capitalization factor of 5.00.~~

~~38.     The one-time valuation bonus was based upon the formula set forth in Exhibit A to the Employment Agreement.  Although Exhibit A, when written in 2008, specifically excluded locations other than Timonium from the calculation, when the Ellicott City and Annapolis LLC Operating Agreements were drafted, Section 6.5 of both agreements specifically incorporated Exhibit A to the Employment Agreement as the basis for calculating the valuation of Mr. Motes' interest in the entities upon his voluntary or involuntary withdrawal.~~

45.     which Motes and Jackson had been ignoring.  To that end, Plaintiffs made several calculations in order to balance the equities of the parties.

46.     Because Motes had been taking the paper profits from Smyth Annapolis and Smyth Ellicott City without taking into account the expenses for the operations of those entities that were paid by the Timonium operation, it was necessary to calculate the cumulative

expenses paid by the Timonium store toward operating expenses of the Annapolis and Ellicott City stores.

47.     At about the same time, Defendant Motes asked Defendant Jackson to assist him in analyzing the proposals being made by the companies.  As Vice President of Operations, Mr. Jackson had access to all of Smyth's business records, which were stored on its IBM System 1 computer system.

39.48.   On September 27, 2016 ~~Mr.~~Defendant Motes met with ~~Tom~~Thomas Smyth, ~~Bob~~Robert Smyth, Jr., Leonard Getschel, Jr., ~~John~~Defendant Jackson ~~III & Bob~~and Robert Yanega to discuss the losses sustained by the Albert S. Smyth Co., Inc. for the years 2013 through 2015. ~~Tom~~Thomas Smyth, ~~Bob~~Robert Smyth, Jr. and Leonard Getschel, Jr. were directors of ~~the Albert S.~~ Smyth ~~Co., Inc.,~~ and~~,~~ along with ~~Mr.~~Defendant Motes~~,~~ were owners of membership interests in Smyth Annapolis, LLC and Smyth Ellicott City, LLC.  After reviewing the companies' financial status ~~of the companies, it was~~, Defendant Motes agreed ~~that Mr. Motes would~~to assign his 25% interest in Smyth Annapolis, LLC and Smyth Ellicott City, LLC to ~~Albert S.~~ Smyth ~~Company, Inc.,~~ in ~~exchange~~consideration for ~~Mr.~~the elimination of Motes' recognized liability for his share of the Timonium store's losses for 2013, 2014 and 2015.  As additional consideration for the forgiveness of ~~Mr.~~Defendant Motes' liabilities for losses for those years, ~~Mr.~~Defendant Motes agreed to the forgiveness of $158,879 of ~~the~~an officer loan he had made to ~~Albert S.~~ Smyth ~~Co., Inc. This left a remaining balance due to Mr. Motes on the promissory note of $176,312..~~  It was agreed at that time that ~~Mr.~~Defendant Motes would continue as COO of the ~~combined entities.  Despite orally agreeing, Defendant refused to execute documents to memorialize the agreement and subsequently rejected it~~Companies.

40.      As a result of the agreement made at the September 27, 2016 meeting, Mr. Defendant Motes was presented with Amendments to the Smyth Annapolis LLC Operating Agreement and theand Smyth Ellicott City LLC Operating Agreement.  Mr. Agreements.  Defendant Motes refused to sign those agreements.

41.      In the meantime, under the management of Motes and Jackson, the financial condition of the Timonium store continued to deteriorate, and the Companies' principals became frustrated with the fact that the severance an agreement could not be finalized, the parties formalized with Defendant Motes.  The Companies' principals met again with Defendant Motes on November 11, 2016.  Mr. Motes wasThe Board presented Defendant Motes with an Employment Severance Agreement, but advised the Company thatwhich he wantedrefused to havesign without consulting his attorneys review the document before he signed it.

42.49.   counsel. The next day, November 12, 2016, Mr. Defendant Motes arrived at the Timonium Store, and publicly announced to Company managersmanagement that he was leaving the Company,Companies amicably, effective immediately, and that he was "taking the high road.". "Unbeknownst to the Board, Defendants Motes and Jackson had all along been planning to leave the Company to go into direct competition with Smyth.

43.      On November 17, 2016 Defendant, by way of a letter from his attorneys, demanded payment of more than $1.8 million that he wrongly claims for his interests in Smyth Ellicott City LLC, Smyth Annapolis LLC and for moneys claimed to be due under the terms of the Subordinated Promissory Note dated July 1, 2012.  (the "Demand Letter").  The  Demand Letter  threated suit against the Companies unless they paid $414,274 within ten days and unless a payment schedule was put in place within that time for an additional $1,437,547.

44. This Demand Letter operated as a rejection of the compromise proposed and accepted by both sides at the September 27, 2016 meeting.

45. Prior to his termination, Defendant had removed inventory for his personal use worth $1,350and has failed and refused to pay for that inventory.

46. Contrary to the allegations of the Demand Letter, a calculation of the accounts stated between the parties reveals that Defendant owes the Plaintiffs the sum of $877,782, calculated as follows:

| | |
|---|---|
| Motes' 25% of 2013- 2015 Losses from Timonium Operations | $1,194,555 |
| Motes' 25% share of net income from Ellicott City and Annapolis Operation through December 31, 2015 | ($179,083) |
| Motes' 25% Equity in Smyth Annapolis LLC | ($566,803) |
| Motes' 25% Equity in Smyth Ellicott City LLC | ($870,744) |
| Motes' Negative Equity in Timonium Operations per Schedule A to Employment Agreement | $1,199,858 |
| Motes' Distribution for Taxes – Jan. 2016 | $100,000 |
| Due from Motes | $877,782 |

COUNT ONE – BREACH OF CONTRACT

50. When Defendant Motes left the Companies' employment, he took with him several key employees, including Defendant Jackson and thirteen others. Upon information and belief, Defendant began to solicit these employees while still employed by Smyth.

51. Prior to leaving the Companies, Defendants Jackson and Mark Motes had access to all of the Companies' books and records, including customer records, employment records, business plans, pricing information, vendor lists and other confidential information. The Companies own the aforesaid information, store it in a Smyth computer repository, and have taken reasonable measures to keep the information secret. Defendants Motes and Jackson, as

long-time employees of Smyth, and Chief Operating Officer and Vice President for Operations, respectively, were given broad discretion to access and utilize this data for the benefit of the Company only because of their fiduciary relationship to the companies.

52.      These records were maintained on an IBM System 1 computer system with limited access granted to specific employees responsible for particular activities of the Companies.   The Company officers controlling that access were Defendants Motes and Jackson. Access to the System 1 computer was controlled by limited password access and security measures designed to assure that the data contained in the Company computer system was secured, including encryption, firewalls and other protective measures. The confidential information was not available to or ascertainable by the general public or by non-key Smyth employees.

53.      Smyth also provided an Employee Handbook to each of its officers and employees, including Defendants Motes and Jackson.  All employees were required to review and sign the Handbook, a key provision of which emphasizes the need to keep the Companies' information secure and provides as follows:

> EMPLOYER INFORMATION AND PROPERTY.  The protection of the Albert S. Smyth Company business information, property and all other Company assets are vital to the interests and success of the Albert S. Smyth Company.  No Albert S. Smyth Company related information or property, including without limitation, documents, files, records, computer files, equipment, office supplies or similar materials (except in the ordinary course of performing duties on behalf of the Albert S. Smyth Company) may, therefore, be removed from the Company's premises or disclosed to anyone outside of the employ of the Albert S. Smyth Company.  In addition, when an employee leaves the Albert S. Smyth Company, the employee must return to the Company all Albert S. Smyth Company related information and property, including originals and copies, that the employee has in his/her possession, including without limitation, documents, files, records, manuals, information stored on a personal computer or on a computer disc, supplies, and equipment or office supplies. Employees should exercise care in

protecting the confidentiality and safety of all information and property of the Albert S. Smyth Company, such as pass-wording computer files, locking up inventory and business information, and limiting access to information and property to only those employees required access in the performance of their duties for the Company.  Violation of this policy is a serious offense and will result in appropriate disciplinary action, up to and including discharge.

54.     The Companies instituted these measures, and others, to safeguard their trade secrets.  Defendants Motes and Jackson were aware of the confidential nature of the information at issue and their duty to keep it secret, and in fact were the principal officers of the company responsible for promulgating, implementing, and enforcing those policies.

55.     The Smyth trade secrets derive independent economic value from not being known to or readily ascertainable by a competitor through proper means.  The Companies compiled the information, including the customer records and lists, over the course of decades.  Through the expenditure of time and money, the Companies gathered, evaluated and tabulated the buying habits of over 69,000 customers in order to enhance their experiences as Smyth patrons, build customer loyalty and ensure Plaintiffs were able to forecast and meet customers' specific needs and desires.  It is impossible for a competitor to duplicate this information on its own.  Plaintiffs' pricing information, vendor relationships and business strategies similarly were developed and honed over many years and transactions to enhance their competitive edge in a market increasingly shifting from brick and mortar stores to online sales, where product pricing is a major component of a sale.  In addition to its business value to Plaintiffs, the information has great independent economic value to potential competitors.  Misappropriation of the Companies' curated confidential information, including but not limited to Customer Lists and preferences, business plans, and pricing strategies, would afford competing businesses an

unjust advantage by providing a ready-made list of customers, vendors and pricing strategies to enhance a competing jeweler's likelihood of success.

56.     Prior to leaving the Companies, Defendant Jackson created and maintained an account in which he stored the Companies' confidential records  with an electronic file hosting service operated by Dropbox, Inc., a San Francisco based company offering cloud storage, file synchronization, multiple layers of security, personal cloud and client software services.  For a person to gain access to the files, he or she must first register with the system using a unique email address.  The user can upload documents and create folders on the platform much like one would do on a workstation or fileserver.  According to the Dropbox website[1], there are three levels of access as follows:

a.  **Owner.**  An Owner is the default role when creating folders or uploading files.  An owner can change view/edit permissions, invite additional people, and transfer ownership to someone else.

b.  **Editor.**  An Editor can add/edit/delete files in the folder just like an owner. However, unless specifically granted by the Owner, the Editor may not remove access to others.  Specifically, the Editor is not able to remove the Owner unless the Owner allows that right.

c.  **Viewer.**  Viewer is the most limited role.  A viewer cannot edit the file, nor may it remove others from access.

57.     Beginning in April 2015, Defendant Jackson began copying massive amounts of Smyth data from the System 1 computer to a Dropbox Account he set up and controlled as the owner.  At first, that account was identified by Mr. Jackson's Smyth email address.   A company address means that the email address is controlled by the company as opposed to an individual.

---

[1] (https://www.dropbox.com/guide/admin/share/set-folder-permissions)

Company email addresses end in "@smythjewelers.com" as opposed to "@me.com" or "gmail.com."

58.     Defendant Jackson surreptitiously changed the email under which the Dropbox account was registered from his @smythjewelers.com account to johnjacksonthree@me.com. Because an Owner level cannot be reviewed by anyone other than the Owner.  Plaintiffs had no power to revoke Mr. Jackson's access to the account.  Even if Smyth employees were given rights to edit the account, Smyth could not permanently delete any data held in the account because it could always be recovered by Defendant Jackson as the owner.

59.     Defendant Jackson had not only access, but control of 49 folders that contained Smyth data and documents (the "Smyth Dropbox Folders").  Eight of those folders were shared with other Smyth employees, but the remaining 41 files were all accessible only by Defendant Jackson.  In fact, Plaintiffs were unaware of the existence of those 41 files until they were identified by Jackson's counsel on August 8, 2017.

60.     Retention of ownership rights to the 8 folders that were shared with other Smyth employees also allowed Defendant Jackson and anyone with whom he shared the information to receive notification when any data was added to those folders by authorized Smyth employees well after Mr. Jackson left Smyth's employment.

61.     Defendant Jackson admitted in the August 8, 2017 transmittal that all of the 49 Smyth Dropbox Folders belonged to Smyth.  Those folders contain more than 3,000 megabytes of data belonging to Smyth, which Defendant Jackson had no right to possess, access or share after he resigned as Vice President of Operations in November 2016.

62.     On April 18, 2016 Defendant Jackson created a Dropbox folder named "MarkJohnSmyth."  That folder contained critical financial and business planning documents including information detailing budget planning, staff salaries, consolidated budgets, and a subfolder entitled "Merger" which contained additional information relating to the business of the companies.  This folder was not shared with anyone employed by Smyth other than Defendants Jackson or Motes.

63.     Another folder created by Mr. Jackson on April 18, 2016 is called "Revenue & Expense 2016."  This folder was not shared with anyone employed by Smyth other than Defendants Jackson and Motes.

64.     Defendant Jackson downloaded virtually all the business records belonging to Smyth into his private Dropbox account.  Upon information and belief, during the time when they were employed by Smyth, Mr. Jackson and Mr. Motes formulated their plan to open a business in competition with Smyth, and in furtherance of their plan downloaded every document that they needed in order to take advantage of the knowledge gained by Smyth through its many years in business.

65.     On or about May 2, 2016 Mr. Jackson provided DLA Piper LLP (US), then personal counsel for Defendant Motes, certain documents relating to Smyth's business and operations. Mr. Jackson acknowledged in transmitting that information that:

> Mark has asked me to prepare this letter, and provide any assistance required. That being said this obviously could cause problems, as I am the Vice President of Operations for the ASC, and related affiliates.  I would ask for discretion in that respect, however my interest is to ensure that equitable interest occurs for all parties involved.

66.     DLA Piper acknowledged that it possessed confidential Smyth documents provided to it by Defendant Jackson and has returned all such documents to Smyth.

67.     On or about June 9, 2016 Defendant Jackson instructed another Smyth Employee to create three Excel Spreadsheets (the "Customer Lists") containing the names, addresses, email addresses, telephone numbers, year to date sales, prior year sales, last purchase date, lifetime purchases, and the average purchase amount of over 69,000 customers.  Those lists also ranked customers based upon lifetime sales for the period of 2012 through 2016 into gold, silver and platinum levels based upon the amount of their purchases.

68.     The Customer Lists were then placed in a Dropbox folder named "ITShare" created and owned by Defendant Jackson.  After Defendant Jackson left the employ of Smyth in November of 2016, he retained ownership and control of the Smyth Dropbox Folders, including the Customer Lists.  Upon information and belief, Defendants used this information to solicit the Companies' customers both before and after Defendants Motes and Jackson left Smyth's employ.

69.     Another account over which Defendant Jackson now has control is a Dropbox folder containing confidential information regarding salaries and other employment information about current and former employees of the Companies.

70.     Also included in the confidential business information over which Defendant Jackson retained exclusive ownership and control is a Dropbox folder containing the Companies' business plans, as well as information relating to its vendors, including information regarding vendor pricing and purchase plans.

71.     By retaining access to the Dropbox folders and changing the ownership of those folders from the @smythjewelers email designation, Defendants have misappropriated those trade secrets by improper means.

72.     The transfer and retention of the Smyth Dropbox Folders was not mere inadvertence.  Since May 2, 2016 when Defendant Jackson turned over confidential files to Defendant Motes' lawyers, Defendant Jackson (and perhaps others affiliated with Meritage) have repeatedly accessed the Smyth Dropbox files without authorization.

73.     The week before turning confidential information over to Motes' lawyers, Defendant Jackson created a folder named "Revenue & Expense 2016."  That folder contains 62 separate files with 49.5 megabytes of detailed budget projections and performance data for calendar year 2016.  Jackson accessed these files as late as September 16, 2016 – as Jackson and Motes were planning their departure from Smyth.

74.     On December 1, 2016, *19 days after resigning his employment with Smyth*, Jackson accessed and modified a Smyth Dropbox Folder named simply "Smyth" containing 1,060 megabytes of data in 1,882 files containing data relating to historical sales, payroll, and purchases accumulated over seven years.

75.     On December 19, 2016 Jackson modified and accessed the folder named "MarkJohnSmyth" that Jackson created on April 18, 2016.  No Smyth personnel other than Motes and Jackson had access right to that folder.  That folder contains 16 files with 21.6 megabytes of data relating to the plan to formally merge Smyth Annapolis, Smyth Ellicott City and Albert Smyth & Co. into a single entity.  Among other things, this file contains the data Jackson supplied to Motes' lawyers.

76.     On January 18, 2017 Defendants filed Articles of Organization of Meritage Fine Jewelers LLC, for the purpose of "retail sales of diamonds, jewelry and related items."  The organizer of Meritage is listed with the Maryland State Department of Assessments and Taxation as Defendant Jackson.

77.     On February 17, 2017 Jackson accessed and modified a Smyth Dropbox Folder entitled "AccountingShare" which contain copies of virtually all of Smyth's accounting records, including capital expenditure plans, budgets, profit and loss statements, accounts payable etc. This folder consists of 3,300 megabytes of data in 9,367 files.

78.     On March 6, 2017 Jackson accessed a Smyth Dropbox Folder entitled "BBB" containing management, sales and budget information for a chain of jewelry stores managed under contract with Smyth Enterprises.   This folder contains 118 files containing 66.5 megabytes of data.

79.     On April 24, 2017 Jackson accessed a Smyth Dropbox Folder named "BobYandJohnInternal" that contains 2016 budget, payroll information, sales information by department and detailed inventory data. This folder contains 22.7 megabytes of data in 110 files.

80.     On May 9, 2017 Jackson accessed a Smyth Dropbox Folder named "HR Info" which contains human resources documentation, including policies and procedures relating to benefit plans, employee disciplinary procedures, and policies relating to sexual and other harassment.  Those policies and procedures were developed over many years and at great expense.  The folder consists of 70 files containing 86 megabytes of data.

81.     On May 16, 2017 Jackson accessed the Smyth Dropbox Folder called "IT Share" containing complete data relating to more than 69,000 discrete customers, ranked by purchase history.  The customer database includes detailed contact information as well as information relating to purchase preferences.  This information has been gathered over years and has allowed Smyth to anticipate and meet the needs and wants of its customers and build relationships.  In addition to the customer database, the IT Share folder contains detailed information relating to IT operations, including firewall, network access, software and security.  Possession of this information could allow unauthorized persons access to the all of Smyth's data.  The IT Share folder contains 791 megabytes of data in 6,106 files.

82.     All of the information contained in the Smyth Dropbox Folders is considered to be trade secrets under the federal Defend Trade Secrets Act and the Maryland Uniform Trade Secrets Act.

83.     On August 30, 2017 Meritage opened for business at its location less than one mile from Smyth's Timonium location.  In its press release, Meritage named as its owners Defendant Jackson, Jennifer McCullough and former Pandora USA co-founder Michael Lund.

84.     Upon information and belief, Defendant Motes and Jennifer McCullough are involved in an intimate partner relationship, and she is a proxy for Defendant Motes, thus abetting Motes' violation of the covenant not to compete contained in his Employment Agreement.

85.     Defendants also announced their intention to open an additional store in 2018.  Upon information and belief, that store is to be located in close proximity to the Smyth Ellicott City location.

86.     Defendants have used Smyth's trade secrets to solicit customers, employees and vendors, and to take advantage of the Companies' business plans, all to unfairly and unlawfully compete with the Companies.

COUNT ONE
(Defend Trade Secrets Act - 18 U.S.C. § 1836)

87.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 86.

88.     The customer data, employee information, business plans, and vendor information constitute trade secrets within the meaning of 18 U.S.C. § 1839.

89.     The goods and services offered by both Plaintiffs and Defendants are used or intended to be used in interstate commerce.

90.     The trade secrets at issue in these proceedings are related to the products and services intended to be used in interstate commerce.

91.     Plaintiffs have taken reasonable measures to maintain the confidentiality of such information, which has independent economic value to the Companies.

92.     If Defendants are permitted to retain any trade secret information, including any copies thereof, or to use or exploit their knowledge of such trade secrets, the Companies will be immediately, substantially and irreparably injured.

93.     The acts of misappropriation of trade secrets were both willful and malicious, done with the intent of using such trade secrets in Defendants' competing jewelry business.

94.     If Defendants are permitted to contact, solicit or do business with any customer listed on the protected Customer List, to exploit the information on the vendor list, or to utilize the personnel information of the Companies' employees to recruit employees in the competing jewelry business, Plaintiffs will be immediately, substantially and irreparably injured.

WHEREFORE, Plaintiff requests the following relief:

A.    That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting, soliciting or doing any business whatsoever with any person listed on the misappropriated Customer List;

B.    That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting, soliciting, employing or otherwise engaging any individual listed in the personnel information contained in the Dropbox folder retained under Defendant Jackson's name, in order to provide services to Defendants or any of them in connection with the sale of jewelry, diamonds or related items;

C.    That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting or soliciting any vendors listed on the list of vendors contained in the Dropbox folder retained under Defendant Jackson's name;

D.    That this Honorable Court enter an Order requiring Defendants to take any and all actions necessary to transfer all data and access rights from any Dropbox account containing any reference to Plaintiffs' customers, employees, vendors, and/or business plans or other information referring or relating to Plaintiffs.

E.    That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from retaining any copies or original Customer Lists, vendor lists, employee lists or business plans;

F.      That this Honorable Court enter an Order directing Defendants to preserve all documents, data, and information pertaining to Plaintiffs, and deliver all such documents, data and information to Plaintiffs' counsel;

G.      That this Honorable Court award damages for actual loss caused by the misappropriation of Plaintiffs' trade secrets as well as damages for any unjust enrichment caused by the misappropriation of the trade secrets;

H.      That this Honorable Court award exemplary damages in an amount not more than two times the actual damages awarded.

I.      That this Honorable Court award Plaintiffs their reasonable attorneys' fees incurred in these proceedings; and

J.      That this Honorable Court grant Plaintiffs such other and further relief as their cause may require.

COUNT TWO
(Maryland Uniform Trade Secrets Act - Md. Code, Comm. Law Art. § 11-1203, *et seq*.)

47 95.   Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 44 94 above as if the same were set out in full herein.

48.     Upon the termination of Mr. Motes' employment, he remained indebted to Plaintiffs in the aggregate amount of $877,782 for moneys he withdrew from the Companies based upon the accounts stated between them.

COUNT TWO – INJUNCTIVE RELIEF

96.     The Court has supplemental jurisdiction to hear claims brought under the Maryland Uniform Trade Secrets Act.

97.     In addition to violating the federal Defend Trade Secrets Act, the actions of the Defendants in misappropriating trade secrets violate Md. Code, Comm. Law Art. § 11-1203, *et seq.* ("MUTSA").

98.     The term "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

99.     The Customer Lists, vendor lists, business plans, and employee data that have been copied and retained by Defendant Jackson constitute trade secrets under the MUTSA, and have, upon information and belief, been shared with the other Defendants in furtherance of establishing a competing jewelry business.

WHEREFORE, Plaintiff requests the following relief:

A.     That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting, soliciting or doing any business whatsoever with any person listed on the misappropriated Customer List;

B.     That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting, soliciting, employing or otherwise engaging any individual listed in the personnel information contained in the Dropbox folder retained under Defendant Jackson's name, in order to provide services to Defendants or any of them in connection with the sale of jewelry, diamonds or related items;

C.      That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting or soliciting any vendors listed on the list of vendors contained in the Dropbox folder retained under Defendant Jackson's name;

D.      That this Honorable Court enter an Order requiring Defendants to take any all actions necessary to transfer all data and access rights from any Dropbox account containing any reference to Plaintiffs' customers, employees, vendors, and/or business plans or other information referring or relating to Plaintiffs.

E.      That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from retaining any copies or original Customer Lists, vendor lists, employee lists or business plans;

F.      That this Honorable Court enter an Order directing Defendants to preserve all documents, data, and information pertaining to Plaintiffs, and deliver all such documents, data and information to Plaintiffs' counsel;

G.      That this Honorable Court award damages for actual loss caused by the misappropriation of Plaintiffs' trade secrets as well as damages for any unjust enrichment caused by the misappropriation of the trade secrets;

H.      That this Honorable Court Award Plaintiffs exemplary damages not to exceed twice any award of actual damages awarded.

I.      That this Honorable Court award Plaintiffs their reasonable attorneys' fees incurred in these proceedings; and

J.     That this Honorable Court grant Plaintiffs such other and further relief as their cause may require.

COUNT THREE
(Breach of Contract v. Mark Motes)

49.100. Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 4699 above as if as if the same were set out in full herein.

50.101. On January 10, 2008, Smyth Co. and Defendant Motes entered into an Employment Agreement, effective January 1, 2007.

51.102. The initial term of the Employment Agreement expired on December 31, 2010, but was extended by agreement in 2009 and by the conduct of the parties.

52.103. To that end, Defendant Motes continued to receive the salary increases, LLC participation and other compensation and benefits and emoluments specified in the Employment Agreement.

104.     As agreed in the Employment Agreement, Defendant Motes became a 25% member in Smyth Ellicott City, Smyth Annapolis, Smyth Enterprises, SMS and TDS.  Each of the LLCs is governed by an Operating Agreement.

105.     Under the terms of each Operating Agreement, each member of the LLC was entitled to receive a distribution of cash flow in accordance with their percentages within 75 days of the end of the taxable year.  In the event of a loss, each member was responsible for the distributive share of such losses.

106.     In 2013, Defendant Motes drew the following amounts from the various entities:

| | |
|---|---|
| Smyth Timonium (Bonus based on 25% of 2012 profits) | $ 73,714 |
| Smyth Annapolis | $ 82,716 |

| | |
|---|---|
| Smyth Ellicott City | $158,555 |
| Smyth Enterprises | $660,569 |
| Smyth Management Services | $ 60,713 |
| | $962,553 |

107.    In accordance with Section 4.1 of the operating agreement of each of the LLCs, profits and losses from each LLC is to be allocated to the interest holder in proportion to their percentage interests.  In 2013, Defendant Motes held a 25% interest in The Diamond Supplier, which lost $1,392,579.  Defendant Motes ignored the losses from The Diamond Supplier, and thus failed to offset $348,145 in losses from that entity against the profits from the other entities.

108.    In accordance with the 2009 Agreement to restructure Defendant Motes' compensation, Motes was also to participate in the profits and losses of Smyth Timonium as though he was a 25% interest holder in that entity.  In 2013, Smyth Timonium lost $1,105,527 under Motes' leadership, which should have resulted in an additional loss of $ 276,382 netted against 2013 profits from the LLCs.

109.    According to the Companies' Reviewed Financial Statements for 2013, the consolidated profit for all of the Companies was $1,981,293.  Motes' share of the profits available for distributions should have been 25% of that amount, or $495,323.The failure to take into account the losses from The Diamond Supplier and Smyth Timonium as well as intercompany eliminations resulted in Defendant Motes overpaying himself by $467,230 for 2013 alone.

110.    In 2014, Defendant Motes drew the following amounts from the various entities:

| | |
|---|---|
| Smyth Annapolis | $   8,768 |
| Smyth Ellicott City | $ 79,780 |
| Smyth Enterprises | $414,841 |

| | |
|---|---|
| Smyth Management Services | $411,218 |
| The Diamond Supplier | $ 11,120 |
| | $925,727 |

111.     According to the Companies' Reviewed Financial Statements for 2014, the consolidated companies lost nearly $2,000,000 from operations, but received income from discontinued operations of nearly $3,000,000.  Defendant Motes' share of the Companies' profit from operations and discontinued operations for that year was $235,251 rather than the $925,727 he took, resulting in an overpayment of $690,476.

112.     In 2015, Defendant Motes drew the following amounts from the various entities:

| | |
|---|---|
| Smyth Annapolis | $ 12,572 |
| Smyth Ellicott City | $197,086 |
| Smyth Enterprises | $728,162 |
| | $937,850 |

113.     According to the Companies' Reviewed Financial Statements for 2015, the consolidated companies lost $1,131,943 from operations, but received income from discontinued operations of $1,597,843.  Defendant Motes' share of the Companies' profit from operations and discontinued operations for that year was $116,475 rather than the $937,820 he took, resulting in an overpayment of $821,345.

114.     For the three years 2013 through 2015, Mr. Motes overdrew the amounts actually due him by $1,979,051.

WHEREFORE, Plaintiffs request the following relief against Defendant Motes only:

A.      That they be awarded damages in the amount to be determined at trial in an amount not less than $2,000,000 for moneys he improperly withdrew from the Companies based upon the accounts stated between them;

B.      That the Plaintiffs be awarded their costs, including reasonable attorneys' fees, incurred in connection with these proceedings; and

C.      That the Plaintiffs be awarded such other and further relief as their cause may require.

### COUNT FOUR
### (Breach of Covenants v. Mark Motes)

115.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 114 as if the same were set out in full herein.

~~53.~~ 116. As a part of his Employment Agreement, Defendant Motes agreed that he would "not directly or indirectly engage in any Competitive Activity . . . within the State of Maryland for two (2) years following the termination of his employment (the "Restricted Period~~")."~~)."

~~54.~~ 117. Competitive Activity is defined in the Employment Agreement as "any Affiliation . . . with any person, corporation, partnership, or other business entity or enterprise pursuant to which he engages in any activities within the State of Maryland which . . . is competitive with the principal business activities in which the Executive engaged, at the time of, or immediately prior to such termination of employment . . . "."

~~55.~~ 118. Further, Defendant Motes agreed that during the term of his employment and for two years thereafter, he would not "directly or indirectly solicit, induce or encourage any employee of the Company, or any consultant or independent contractor providing services to the Company, to leave the Company or to join or perform services for any other company."

~~56.~~ 119. Defendant Motes also agreed that during the term of his employment and for two years thereafter he would not "directly or indirectly solicit, induce or encourage any entity or person who is a customer, vendor or supplier of the Company to cease to engage the

services of the Company in order to use the services of any entity or person that competes

directly with the Company . . . ."

57.120. Plaintiffs have become aware that Defendant hasDefendants have negotiated with

current and/or former customers, vendors and suppliers to provide himthem with financial

backing, inventory and services to open retail jewelry stores directly competitive with, and in

close proximity to, the Companies' locations.

121.    Plaintiffs have also become aware that Defendant intends to solicitMotes has

solicited Smyth employees of the Companies to leave the Companies and to become employed

by him or his affiliated entities in the.

58.    These competitive jewelry businesses he intends to open.

59.122. These activities violate the terms of Defendant'sDefendant Motes' Employment

Agreement, and are likely to cause immediate, substantial and irreparable injury to the

Plaintiffs.

WHEREFORE, Plaintiffs demandrequest the following relief:

A.    That they be awarded damages in the amount of $877,782 for moneys he improperly

withdrew from the Companies based upon the accounts stated between them;

B.    That they be awarded damages in the amount of $1,350 for inventory taken and not

returned that belongs to the Albert S. Smyth Co., Inc.;

C.A.    That they be awarded a preliminary and permanent injunction enforcing the

non-competition and non-solicitation covenants contained in the Employment Agreement;

D.B.    That the Defendant Motes be enjoined preliminarily and permanently from

directly or indirectly engaging in the wholesale or retail jewelry business or in any other activity

which competes with the business of the ~~Company~~Companies within the State of Maryland for two (2) years following the termination of his employment;

~~E.~~C.     That ~~the~~ Defendant Motes be enjoined preliminarily and permanently from directly or indirectly soliciting, inducing or encouraging any entity or person who is a customer, vendor or supplier of the ~~Company~~Companies to cease to engage the services of the ~~Company~~Companies within the State of Maryland for two (2) years following the termination of his employment;

~~F.~~D.     That ~~the~~ Defendant Motes be enjoined preliminarily and permanently from directly or indirectly soliciting, inducing or encouraging any employees of the Companies to leave the Companies; and

~~G.A.     That the Plaintiffs be awarded their costs, including reasonable attorneys' fees, incurred in connection with these proceedings; and~~

~~H.A.     That the Plaintiffs be awarded such other and further relief as their cause may require.~~

E.     That Plaintiffs be awarded their costs, including reasonable attorneys' fees, incurred in these proceedings; and

F.     That the Plaintiffs be awarded such other and further relief as their cause may require.

COUNT FIVE
(BREACH OF FIDUCIARY DUTY/LOYALTY)

123.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through ~~11~~22 above as if more fully set out herein.

124.     Until November 2016, Defendants Motes and Jackson were senior management employees and officers of Smyth.

125.     While still employed at Smyth, Defendants Motes and Jackson owed a duty of loyalty to the company, not to solicit Smyth's customers, not to set up a competing enterprise, not to misappropriate trade secrets, not to misuse confidential information for their own benefit, not to conspire to bring about the resignation of company employees, and not to usurp Smyth's business opportunities.

126.     While still employed at Smyth, Defendants Motes and Jackson conspired together to misappropriate Smyth's customer lists, business plans and financial information, and to solicit customers and employees to follow them to their new competing business enterprise, Defendant Meritage.

127.     While still employed at Smyth, during the term of their employment both Defendants Motes and Jackson solicited numerous employees of Smyth to leave the employment of Smyth and join them in establishing Defendant Meritage.

128.     By breaching their duty of loyalty, Defendants Motes and Jackson have caused damage to Smyth in the form of lost sales, employee costs, and goodwill.

WHERERFORE, Plaintiff requests the following relief:

A.     That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting, soliciting or doing any business whatsoever with any person listed on the misappropriated customer list;

B.     That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting, soliciting, employing

or otherwise engaging any individual listed in the personnel information contained in the Dropbox folder retained under Defendant Jackson's name, to provide services to Defendants or any of them in connection with the sale of jewelry, diamonds or related items;

C.      That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from contacting or soliciting any vendors listed on the list of vendors contained in the Dropbox folder retained under Defendant Jackson's name;

D.      That this Honorable Court enter an Order requiring Defendants to take any all actions necessary to transfer all data and access rights from any Dropbox account containing any reference to Plaintiffs' customers, employees, vendors, and/or business plans or other information referring or relating to Plaintiffs.

E.      That this Honorable Court enter an Order preliminarily and permanently enjoining Defendants, or anyone acting on their behalf, from retaining any copies or original Customer Lists, vendor lists, employee lists or business plans;

F.      That this Honorable Court enter an Order directing Defendants to preserve all documents, data, and information pertaining to Plaintiffs, and deliver all such documents, data and information to Plaintiffs' counsel;

G.      That this Honorable Court award damages for actual loss caused by the misappropriation of Plaintiffs' trade secrets as well as damages for any unjust enrichment caused by the misappropriation of the trade secrets;

H.      That this Honorable Court award Plaintiffs exemplary damages in an amount to be determined at trial.

I.      That this Honorable Court award Plaintiffs their reasonable attorneys' fees incurred in these proceedings; and

J.      That this Honorable Court grant Plaintiffs such other and further relief as their cause may require.


                                   FEDDER & ~~JANOFSKY,~~JANOFSLY LLC


                                   _____

January 18, 2018_____                              /s/_____
Date                               Steven K. Fedder
_____  USDC MD Bar No. 000873
_____  Julie C. Janofsky
_____  USDC MD Bar No. 002622
_____  2650 Quarry Lake Drive —, Suite 100
_____  Baltimore, Maryland 21209
_____  (410) 415-0080
                                   ~~sfedder@mdcounsel.com~~


_____  sfedder@mdcounsel.com

_____  *Attorneys for Plaintiffs*

### JURY TRIAL DEMAND


Plaintiffs elect to have the above-captioned matter tried before a jury.




                                   _____/s/_____
      _____
                                   Steven K. Fedder