IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Albert S. Smyth Co., Inc., *et al.*　　　　*

v.　　　　　　　　　　　　　　　　　　　*　　Civil Action No. CCB-17-677

Mark A. Motes, *et al.*　　　　　　　　　　*

　　　　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　***

## Memorandum

The plaintiffs, Albert S. Smyth Co., Inc., Smyth Ellicott City, LLC, Smyth Annapolis, LLC, Smyth Management Services, LLC (SMS), Smyth Enterprises LLC, and TheDiamondStore.com (TDS), (collectively "Smyth"), have sued Mark A. Motes, John Jackson, III, and Meritage Fine Jewelers for violations of the (1) Defend Trade Secrets Act (all defendants) and the (2) Maryland Uniform Trade Secrets Act (all defendants), as well as for (3) Breach of Contract (Motes), (4) Breach of Covenants (Motes), and (5) Breach of Loyalty (Motes and Jackson). After Smyth filed a third amended complaint, (ECF No. 65), the defendants moved for dismissal, (ECF Nos. 66, 68, 69). For the reasons stated below, the motions filed by Motes and Meritage will be granted, and the motion filed by Jackson will be granted in part and denied in part.

## Background

This dispute begins with a promotion. In 2007, Mark A. Motes was promoted to Chief Operating Officer of Smyth Timonium, a family jewelry business, after a decade at the company. (Third Am. Compl. at ¶ 11). Motes's promotion was set out in an Employment Agreement that included the following terms: (1) Motes was granted a 25% interest in all operating entities and in each subsequently established retail subsidiary; (2) his partnership was limited by the "rights,

1

duties and obligations . . . set forth in" each entities' Operating Agreement; (3) Motes was granted a Valuation Bonus to be paid on the termination of his employment; and (4) Smyth would pay him a $600,000 salary, increased by $25,000 yearly. (*Id.* at ¶¶ 13-15).[1] As Smyth grew so too did Motes's 25% interest: Motes took an ownership interest in Smyth Annapolis, LLC and Smyth Ellicott City, LLC in 2008; Smyth Enterprises, LLC in 2009; TheDiamondSupplier.com, LLC in 2011; and Smyth Management Services, LLC in 2012. (*Id.* at ¶¶ 16-19). These entities were not all successful, however, and several were closed—Smyth Enterprises, Smyth Management Services, and TheDiamondSupplier.com—between 2014 and 2015. (*Id.* at ¶ 22).

As the complaint tells it, the parties revisited Motes's Employment Agreement in 2009 to more perfectly capture his position as a full partner in the business. The result was a freezing of Motes's Valuation Bonus at $62,302 and a new compensation scheme. Motes would now share Smyth's profits and losses on a *consolidated* basis. (*Id.* at ¶ 25). Thus, Motes's interest for any year was 25% of *all* profits less *all* losses. All of this occurred by oral agreement, however. Smyth alleges that it complied with the new agreements until Motes left the company. (*Id.* at ¶ 26). Motes, allegedly, did not.

From 2013 to 2015 Motes took a combined $2,826,100 share of Smyth's profits. But a consolidated accounting of Smyth's finances, one that would reflect the parties' alleged oral modification, entitled Motes to only $336,648 over the same period. (*Id.* at ¶ 39). To properly account for the losses he should have taken, Motes (again) allegedly orally agreed, in September 2016, to transfer his 25% interest in Smyth Annapolis, LLC and Smyth Ellicott City, LLC to Smyth and to forgive a $158,879 loan he gave to Smyth. (*Id.* at ¶ 48). Yet, when presented with a

---

[1] On a motion to dismiss the court may consider documents that are integral to the complaint. *Goines v. Valley Cmty Servs Bd.*, 822 F.3d 159, 164 (4th Cir. 2016).

2

written version of the agreement, Motes refused to sign. (*Id.* at ¶ 49). Smyth met with Motes again on November 11, 2016, and presented him with an employment severance agreement, which he also refused to sign. (*Id.*) Motes resigned the next day. (*Id.*) He allegedly took more than thirteen employees with him, including John Jackson III. (*Id.* at ¶ 50).

But not just employees: the complaint also alleges that Motes and Jackson left with "the Companies' confidential records." (*Id.* at ¶ 56). This information represents "the buying habits of over 69,000 customers." (*Id.* at ¶ 55). It was protected by a security system, including a password and an Employee Handbook that warned employees not to remove confidential information from company computers or files, (*id.* at ¶¶ 52-53).

Starting in April 2015, Jackson began copying the plaintiffs' business information to a Dropbox account he owned. (*Id.* at ¶ 57).[2] Although some folders created in the account were shared with other Smyth employees, most of the data was controlled by Jackson and, according to the complaint, possibly Motes. (*Id.* at ¶¶ 59-62). Based on their own "information and belief," the plaintiffs allege that the copying of their data was part of Motes's and Jackson's plan to start a competing jewelry business. (*Id.* at ¶ 64).[3]

Since he left the company, Jackson has repeatedly accessed the files, even after he helped start a competing jewelry business named Meritage Jewelers. (*Id.* at ¶¶ 74-81). Articles of Organization were filed for Meritage in January 2017, (*id.* at ¶ 76), and the company opened for business eight months later in August 2017, (*id.* at ¶ 83). Jackson is one of three owners. His partners are Jennifer McCullough—allegedly Motes's romantic partner—and Michael Lund. (*Id.*

---

[2] Jackson's Dropbox account was originally registered using his company email address. He has since changed the account's email address to his own. (Third Am. Compl. at ¶ 58).
[3] In May 2016, before he left Smyth, Jackson provided DLA Piper, the law firm representing Motes, access to some of Smyth's business information in connection with a proposed merger of Smyth Annapolis LLC, Smyth Ellicott City LLC, and Albert S. Smyth Co., Inc. (Third Am. Compl. at ¶¶ 47, 65). DLA Piper has since returned that information to Smyth. (*Id.* at ¶ 66).

3

at ¶¶ 83-84). The plaintiffs allege that the defendants have used the business information they copied to support Meritage. (*Id.* at ¶ 86).

***

The plaintiffs filed suit in March 2017. After the court granted the plaintiffs' leave to filed a third amended complaint, (ECF Nos. 64, 65), the defendants moved to dismiss the complaint under Rule 12(b)(6), (ECF Nos. 66, 68, 69).

**Standard of Review**

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). And the plaintiff typically must do so by relying solely on facts asserted within the four corners of his complaint. *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015).

**Analysis**

The defendants' motions will be granted in part and denied in part. Because Smyth sufficiently alleges that Jackson misappropriated business records under the meanings of the Defend Trade Secrets Act and the Maryland Uniform Trade Secrets Act, his motion to dismiss as to those claims will be denied. But because Smyth has failed to sufficiently allege the same for

Motes and Meritage, or the existence of an oral modification to the parties' original agreement, and because Jackson and Motes never violated their duty of loyalty during their employment, the defendants' motions as to Smyth's remaining claims will be granted.

I. Federal Trade Secrets

Smyth first claims that Motes and Jackson violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, by using copied business records to solicit customers or to seize an advantage in the jewelry market. The DTSA creates a private right of action allowing an owner of a misappropriated business record to bring a civil action so long as the business record "is related to a product or service used in, or intended for use in, interstate or foreign commerce."[4] 18 U.S.C. § 1836(b)(1).[5]

Because Jackson allegedly accessed the "Companies' books and records, including customer records, employment records, business plans, pricing information, vendor lists and other confidential information" after he left the company and started a competing jewelry business, his motion to dismiss this claim will be denied. (Third Am. Compl. at ¶ 51). But because the complaint has not sufficiently alleged that Motes or Meritage acted similarly, their motions to dismiss will be granted.

A. The Business Records are Trade Secrets

The DTSA defines "trade secret" broadly, including within its umbrella: "all forms and

---

[4] The defendants challenge whether the products or services related to Smyth's business records were "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). At the motion to dismiss stage, it is sufficient that Smyth alleges that it does business over the internet. The court may easily infer that an online jewelry business attracts out-of-state customers to Smyth's products.

[5] As far as the court can find, the Fourth Circuit has not yet issued a decision involving the DTSA, and the District of Maryland has only referenced the statute three times. Of those three references, one is the court's earlier decision in this case, (ECF No. 63), another merely cited the statute, *Open Text Corp. v. Grimes*, 262 F. Supp. 3d 278 (D. Md. 2017), and the last was in a case involving documents that were publicly available online and were downloaded and accessed at the behest of an employer, *Center for Advancing Innovation, Inc. v. Bahreini*, 2018 WL 2100279 at *3-*4 (D. Md. May 4, 2018).

5

types of financial, business, scientific, technical, economic, or engineering information, including," among other things, "patterns, plans, compilations . . . methods, techniques, processes, [or] procedures . . . whether tangible or intangible" so long as "the owner thereof has taken reasonable measures to keep such information secret and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(A)-(B) (numeration removed).

The defendants insist that Smyth's business records are not trade secrets because Smyth failed to protect their confidentiality, evidenced in part by the defendants' ability to access and maintain them in Dropbox accounts, and because the records do not derive independent economic value from their confidentiality. The court disagrees.

To start, Smyth did take steps to protect its records. Its employees were prohibited from disclosing "company information and property," and it stored its business records on encrypted servers protected by firewalls to which only a handful of employees were granted access. (Third Am. Compl. at ¶¶ 52-54). More still, an employee handbook made clear that employees were not to disclose company records to non-employees, and explained how employees might keep confidential information safe. (*Id.* at ¶ 53). Indeed, the handbook noted that violating the company's confidentiality policies could lead to termination. (*Id.*)

That some employees kept this information in Dropbox accounts does not alter this conclusion. Such accounts are private, requiring a Username and Password, and thus shield the documents they contain from everyone but those with the necessary login credentials. An employee's failure to protect the confidentiality of business records, in violation of an express

policy, means no more than that an employee failed to protect the confidentiality of business records, and certainly not, without more, that a company did not take reasonable steps to protect its records. Taking the allegations in the complaint as true, Smyth's conduct constitutes reasonable steps to protect the confidentiality of its business records.

Smyth's business records also are valuable by virtue of their confidentiality. Smyth alleges that these records include decades of "customer records and lists" that contain "the buying habits of over 69,000 customers" and the company's "pricing information, vendor relationships and business strategies," which, no doubt, would be of value to a competitor. In a competition for sales, information about potential customers and their buying habits, a competitor's pricing, business strategies, and vendors is a windfall, granting the recipient a key to undercut the competition's pricing, outbid their vendor contracts, and attract their customers. There is thus no doubt that Smyth's records were valuable because of their confidentiality. Because Smyth took reasonable steps to protect the confidentiality of business records and their value derives from their confidentiality, they constitute trade secrets within the meaning of 18 U.S.C. §1839.

## B. Smyth's Trade Secrets were Misappropriated

The defendants also argue that, even assuming the records do constitute trade secrets, the plaintiffs have not sufficiently alleged that the secrets were misappropriated. A trade secret is misappropriated if it was acquired: (1) "by a person who knows or has reason to know that the trade secret was acquired by improper means;" (2) "under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret;" or (3) if it was disclosed "without express or implied consent by a person who used improper means to acquire knowledge of the trade secret," or "at the time of disclosure or use, knew or had reason to know

7

that the knowledge of the trade secret was derived from or through a person who had used improper means to acquire the trade secret." 18 U.S.C. § 1839(5)(A), (B)(i), (B)(ii)(I)-(II).[6]

The complaint alleges that Jackson accessed Smyth's trade secrets seven times after his employment was terminated, and five times after he filed documents with the state of Maryland to open a competing jewelry business. (Third Am. Compl. at ¶¶ 74-82). Rather than conclusory statements, Smyth offers specific allegations detailing how and when its business records were accessed.

Jackson makes much of the fact that the plaintiffs allege only that he accessed *folders* containing trade secrets but not that he accessed the trade secrets themselves. Though correct, this careful parsing of the complaint misses the mark. A claim has been sufficiently pleaded when its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is reasonable to infer that if Jackson accessed and modified folders containing trade secrets, he also viewed the files within those folders. Considering that evidence within the larger constellation of facts alleged in the complaint, most importantly the allegation that the folders were accessed after Jackson filed Articles of Organization for a competing jewelry business, makes it plausible that Jackson in fact used Smyth's business records and therefore misappropriated them. Accordingly, Jackson's motion to dismiss Smyth's claim under the DTSA will be denied.

The plaintiffs' DTSA claim suffers a different fate as to Motes and Meritage, however. The complaint fails to allege, in non-conclusory terms, how Motes or Meritage ever used Smyth's business trade secrets.[7] For this reason, this claim will be dismissed as to Motes and

---

[6] This is a non-exhaustive definition but provides the relevant provisions for the issues presented here.
[7] To be sure, Jackson is involved with Meritage, but a member of a limited liability company is generally an agent of the company only "for the purpose of its business." MD. CODE, CORP. & ASS., §4A-401(a)(1). Indeed, an agent's action does not bind his company if he acts without "authority to act for the limited liability company in the

Meritage.

II. Maryland Trade Secrets

Smyth also alleges that Motes and Jackson violated the Maryland Uniform Trade Secrets Act ("MUTSA"). To make out a claim under MUTSA Smyth must show that "(1) it possessed a valid trade secret, (2) that the defendant acquired its trade secret, and (3) that the defendant knew or should have known that the trade secret was acquired by improper means." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993). The statute defines a trade secret as:

> information, including a . . . compilation . . . that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MD. CODE COM. LAW § 11-1201(e). Of particular importance to Maryland courts is whether the information a business seeks to protect is readily ascertainable from the marketplace. *See LeJeune v. Coin Acceptors, Inc.*, 849 A.2d 451, 461-64 (Md. 2004)(collecting cases).

The MUTSA defines misappropriation as the:

A. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
B. Disclosure or use of a trade secret of another without express or implied consent by a person who:
    i. Used improper means to acquire knowledge of the trade secret; or
    ii. At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
        I. Derived from or through a person who had utilized improper means to acquire it;
        II. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
        III. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    iii. Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

---

particular matter." MD. CODE, CORP. & ASS., §4A-401(a)(2)(1). Smyth has neither alleged that Jackson acted on behalf of Meritage or that Meritage authorized his activity.

MD. CODE COM. LAW §11-1201(c).

Like its federal counterpart, the MUTSA requires courts to consider: "(1) whether the information at issue qualifies as a trade secret; and (2) whether an individual has actually misappropriated that information or has threatened to misappropriate it." *LeJeune*, 849 A.2d at 461. As with the DTSA, Smyth has met its burden under the MUTSA as to Jackson but not as to Motes and Meritage.

Because Smyth took reasonable steps to secure the secrecy of its business records, because the value of the information is not readily ascertainable from the marketplace and thus derives its value from its confidentiality, and because the complaint alleges that Jackson—but not Motes or Meritage—accessed those files after he left Smyth and started a competing jewelry business, this claim survives as to Jackson, but will be dismissed as to Motes and Meritage.

III. Breach of Contract

Smyth next claims that Motes breached his duties under the Employment Agreement. To make out a breach of contract claim under Maryland law a plaintiff "must of necessity allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by [the] defendant." *RRC Northeast, LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 440 (Md. 2010) (internal quotation marks and emphasis removed).

Maryland law recognizes oral contracts. *Macsherry v. Sparrows Point, LLC*, 2017 WL 3315262 at *18 (D. Md. Aug. 3, 2017).[8] It also recognizes that a written contract, even one that "stipulates that it may not be varied except by an agreement in writing," may be modified by "subsequent oral agreement." *Hovnanian Land Inv. Group, LLC v. Annapolis Towne Centre at*

---

[8] Unpublished opinions are cited for the strength of their reasoning and not for any precedential value.

*Parole, LLC*, 25 A.3d 967, 978-79 (Md. 2011).[9]

Smyth contends that by a 2009 oral agreement, Motes's employment agreement was altered granting Motes a 25% interest in the *consolidated* profits and losses of Smyth Ellicott City, Smyth Annapolis, Smyth Enterprises, SMS, and TDS. (Third Am. Compl. at ¶ 25). Motes breached this agreement, according to the plaintiffs, by continuing to treat his interest on an individual, entity-by-entity, basis. Because the plaintiffs have failed to show with certainty and definiteness that an oral agreement was reached, the complaint fails to plausibly show that Motes breached his contractual obligations.

A.

Besides its own conclusory statements, Smyth does not proffer any evidence of the oral agreement. Indeed, the parties' conduct, here the evidence by which the existence of an oral contract will largely stand or fall, cuts against Smyth's claim. Consider Motes's behavior first. After the alleged modification of his employment agreement, according to the complaint Motes continued to take his 25% interest on a non-consolidated basis, as he was entitled to under his original employment agreement, and neither he nor Smyth acted as if this were improper. Indeed, Smyth never acted as if a new contract had been formed: specifically, for the three years from 2013 to 2015 it showed no recognition that Motes had not taken a consolidated stake in the companies, costing itself over $2 million. (*Id.* at ¶ 39). For a sophisticated company, allegedly against the ropes, this is an implausible oversight. (*See, e.g., id.* at ¶ 35).

But even putting that aside, Smyth's operating agreements with Motes also suggest that

---

[9] Motes's original employment agreement prohibited oral modification. To prove the existence of an oral modification of a non-oral modification provision, Smyth must show that the parties: "(1) intended to modify the terms, and (2) understood that they were waiving the policy's prohibition against oral contract modifications." *Maryland Auto. Ins. Fund v. John*, 16 A.3d 1008, 1015 (Md. App. Ct. 2011). Because the court does not find that Smyth sufficiently alleges any oral contract, let alone one that modified the parties' earlier non-oral modification provision, it does not reach this issue.

11

an oral agreement was never reached. Recall that each subsidiary's operating agreement set out obligations on Motes's interest, and each calculated Motes's interest on an *individual* rather than a *consolidated* basis. (ECF No. 66, Exs. 2-4). Thus, Smyth would have it that Motes was bound to take an interest in consolidated profits and losses, but each of Smyth's subsidiaries was bound to let Motes take his interest on an individual basis. That would, no doubt, be a puzzling feature of the parties' contractual relationship.

Alone, this fact might just represent another oversight (though that itself strains credulity). Context, however, suggests otherwise. Smyth knew how to make alterations to operating agreements when they conflicted with a proposed change in Motes's employment agreement. In 2016, Smyth tried to amend two operating agreements, seven years after the alleged oral agreement was reached, as part of an attempt to have Motes sign over his interest in Smyth Annapolis and Smyth Ellicott City. The complaint then does not cast Smyth's behavior as a mistake, but rather as another allegation in a series of allegations that are entirely, and most plausibly, considered consistent with there never having been an oral agreement at all.

Falling back, Smyth points to its proposed amendments to the two operating agreements as evidence that an oral agreement was reached. Smyth did attempt to reach a new agreement with Motes in light of his alleged breach of contract, in which Smyth would forgive what Motes owed the company if Motes agreed to give up his 25% interest in Smyth Annapolis and Smyth Ellicott City. (*Id.* at ¶ 48). And if the parties had reached that agreement, it would lend some support to the plaintiffs' claim. But Motes never did agree to those terms, and resigned soon after they were presented to him. (*Id.* at ¶ 49).

The short of it is this: Smyth has failed to provide any evidence of the oral agreement, and failed itself for seven years to act as if it were bound by the agreement. Indeed, the thrust of

12

the complaint cuts in the opposite direction. On just these facts, Smyth has failed to present a plausible claim for breach of contract.

IV. Breach of Covenants

Next, Smyth argues that Motes breached the non-compete and non-solicitation clauses of his employment agreement. (*Id.* at ¶¶ 116-19). A restrictive covenant will be upheld under Maryland law if it is "supported by adequate consideration" and "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Ecology Services, Inc. v. Clym Environmental Services, LLC*, 952 A.2d 999, 1006-07 (Md. App. Ct. 2008) (quoting *Becker v. Bailey*, 299 A.2d 835, 838 (Md. 1973)).

> If the agreement is reasonable on its face, the court must then consider:
>
> whether the person sought to be enjoined is an unskilled worker whose services are not unique; whether the covenant is necessary to prevent the solicitation of customers or the use of trade secrets, assigned routes, or private customer lists; whether there is any exploitation of personal contacts between the employee and customer; and, whether enforcement of the clause would impose an undue hardship on the employee or disregard the interests of the public.

*Id.* at 1007 (quoting *Budget Rent A Car of Wash., Inc. v. Raab*, 302 A.2d 11, 13 (Md. 1973)).

Motes agreed to be bound by non-compete and non-solicitation covenants for two years after his employment was terminated. The parties agree that the covenants are reasonable and should be enforced, but dispute whether they persisted beyond the term of Motes's original employment agreement, and, if they were extended, whether the complaint sufficiently pleads that Motes breached the covenants. Because nothing in the now-expired employment agreement suggests that the covenants would persist past the contract term, and because Smyth has not alleged sufficient facts to show that Motes breached the covenants even if they had, Smyth has

failed to state a claim.

## A. Non-Compete Covenant

Smyth first asserts that the non-compete agreement persisted after the terms of Motes's original employment agreement lapsed in 2010. Smyth's argument rests not on an express term of the contract (there is not one), or a reasonable inference from suggestive contract terms (there is none of that either), but instead on the fact that the contract does not say otherwise, and that the parties conducted themselves after 2010 as if the terms of the original employment agreement still applied. Neither is a persuasive ground.

Applying the fundamental principle of contract interpretation in Maryland—to "give effect to [the contract's] language as written"—to the parties' contract makes clear that the non-compete covenant did not outlast the contract. *Ocean Petroleum, Co., Inc. v. Yanek*, 5 A.3d 683, 690 (Md. 2010).[10] The contract expressly states that it expires in 2010 and fails to include a single term suggesting that its non-compete covenant was to outlast the expiration date. Smyth has not therefore sufficiently alleged a breach of a restrictive covenant on the terms of the original employment agreement alone.

Nevertheless, Smyth insists that Motes was bound by the parties' 2009 oral agreement to extend and modify the terms of the original employment agreement. And that agreement, according to Smyth, included a non-compete clause. Even if the parties had reached an oral agreement, however, an oral non-compete covenant extending for two years after the end of Motes's employment would be invalid under Maryland's statute of frauds.

Under Maryland law, any agreement that cannot "be performed within [one] year from the making of the agreement" must be in writing. MD. CODE, CTS. & JUD. PROC. § 5-901(3); *See also Macsherry*, 2017 WL 3315262 at *24. An oral contract that is otherwise invalid under the

---

[10] This is true so long as the contract is not ambiguous. *Ocean Petroleum*, 5 A.3d at 690.

statute of frauds may be rehabilitated by the doctrine of part performance. *See Friedman & Fuller, P.C. v. Funkhouser*, 666 A.2d 1298, 1306-07 (Md. App. Ct.1995) (disapproved of, on other grounds, by *Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 532 n.29 (Md. 1996)). But the plaintiffs' part performance "must furnish . . . unequivocal evidence of the particular agreement" alleged. *Id.* (quoting *Beall v. Beall*, 434 A.2d 1015, 1019 (Md. 1981). For the reasons already stated, Smyth fails to furnish "unequivocal evidence" of an oral non-compete covenant.

Finally, even if the non-compete clause was a term in an oral modification, and even if the term was not barred by the statute of frauds, Smyth's claim would still fail under Rule 8. Smyth's only support for its contention that Motes violated the non-compete provision is that his wife, Jennifer McCullough, is a part-owner of Meritage, a competing jewelry business.

Assuming without deciding that working at Meritage would violate the terms of the non-compete agreement, nothing in the complaint suggests that Motes is personally involved with Meritage, or that he is working vicariously through McCullough. Thus, Smyth's breach of a non-compete covenant claim must be dismissed under Rule 8.

### B. Non-Solicitation Covenant

Next Smyth argues that Motes breached the non-solicitation provision of the employment agreement by negotiating with current and former "customers, vendors and suppliers." (Third Am. Compl. at ¶ 120).

The agreement prohibits Motes from soliciting, inducing, or encouraging any Smyth employee "to leave the Company or to join or perform services for any other company" or "any entity or person who is a customer, vendor or supplier of the Company to cease to engage the services of the Company in order to use the services of any entity or person that competes

15

directly with the company." (ECF No. 66, Ex. 1, at 6).

For all the reasons that Smyth has failed to sufficiently allege that Motes is bound by the non-compete covenant, Smyth also fails to allege that Motes is bound by the non-solicitation covenant. Indeed, the complaint merely alleges "upon information and belief" that Motes solicited Jackson and thirteen other employees while he was still employed. But there are no factual allegations to support that bare claim, as for example, when or how these employees were solicited, or even who most of them are.

V.      Breach of Implied Duty of Loyalty

Finally, Smyth argues that Motes and Jackson breached their duty of loyalty to the company by misappropriating "Smyth's customer lists, business plans and financial information" and by soliciting "customers and employees to follow them to their new competing business enterprise, Defendant Meritage." (Third Am. Compl. at ¶ 126). Maryland courts "read into every contract of employment an implied duty that an employee act solely for the benefit of his employer in all matters within the scope of employment," and thus an employee "must refrain from actively and directly competing with his employer for customers and employees." *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978). Still, employees are free "to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty" so long as the employee's activity is not "so harmful as to substantially hinder the employer in the continuation of his business." *Id.* at 569. And an employee's duty of loyalty is extinguished at the end of his employment with the company. *Id.* at 568. This claim too will be dismissed.

As already stated, Smyth has not sufficiently alleged that Motes and Jackson solicited

customers and employees, let alone that they did so during their employment. But even if Smyth had satisfied Rule 8 on this count, it fails on another. The complaint does not even suggest that Motes's and Jackson's conduct was anything more than preparation to compete and certainly never alleges that their preparation substantially hindered Smyth's business. That is not surprising; the defendants did not start competing with Smyth until after their employment was terminated.

That leaves Smyth's claim that Jackson and Motes misappropriated customer lists, business plans, and financial plans. Smyth has stated a claim under the DTSA and the MUTSA as to Jackson, but that fact alone does not support a breach of loyalty claim, as neither statute requires as a precondition that the defendants misappropriate trade secrets *during* their employment with Smyth. And that difference is fatal here because the complaint fails to sufficiently allege that Jackson misappropriated files during his employment. Smyth granted Jackson access to its business records and allowed him to keep those records in a Dropbox account; there is no allegation that Jackson used or stored the information in a manner that substantially hindered Smyth's business during his employment. Thus, not only must this claim be dismissed as to Motes, it also will be dismissed as to Jackson.

## Conclusion

For the reasons stated above, the defendants' motions will be denied in part and granted in part. A separate order follows.

7/31/18
Date

Catherine C. Blake
United States District Judge