IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ALBERT S. SMYTH CO., INC., *et al*. | * | |
| | * | |
| v. | * | Civil No. CCB-17-677 |
| | * | |
| MARK A. MOTES, *et al*. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

The plaintiffs, Albert S. Smyth Co., Inc.; Smyth Ellicott City, LLC; Smyth Annapolis, LLC; Smyth Management Services, LLC; Smyth Enterprises LLC; and TheDiamondSupplier.com (collectively "Smyth"),[1] sued Mark A. Motes; John Jackson, III; and Meritage Fine Jewelers ("Meritage") for violations of (1) the Defend Trade Secrets Act (all defendants) and (2) the Maryland Uniform Trade Secrets Act (all defendants), as well as for (3) Breach of Contract (Motes), (4) Breach of Covenants (Motes), and (5) Breach of Loyalty (Motes and Jackson). (*See* Third Amended Complaint ("TAC"), ECF 65). Motes filed a counterclaim against Smyth Ellicott City, LLC and Smyth Annapolis, LLC (collectively "the LLCs"), alleging breach of contract claims. (ECF 52).

On July 31, 2018, the court dismissed all of Smyth's claims against Motes and Meritage. (ECF 75, 78).[2] Smyth filed a motion for reconsideration, (ECF 81), which the court denied, (ECF 97).

---

[1] Smyth alternates between listing "TheDiamondStore.com" and "TheDiamondSupplier.com" as plaintiffs in this action. (*Compare* Third Amended Complaint ("TAC"), ECF 65 *with* Plaintiffs' First Motion to Reconsider, ECF 81). It is unclear whether these refer to the same entity. Smyth also alternates between filing motions on behalf of all the plaintiffs and on behalf of just a subset of them. (*Compare* First Motion to Reconsider, ECF 81 *with* Second Motion to Reconsider, ECF 111). For the purposes of this motion, however, the court need not resolve whether these inconsistencies are deliberate choices or simply errors.

[2] The court issued its original Order dismissing the claims against Motes and Meritage on July 31, 2018, (ECF 76) but on August 3, 2018, issued an Amended Order clarifying that although all claims against Motes were dismissed, Motes remained in the case as a counterclaimant, (ECF 78).

1

Discovery in this matter is now complete. Now pending before the court is Smyth's second motion for reconsideration of the dismissal of Smyth's claims against Motes or, in the alternative, to amend the complaint. (ECF 111). The motion is fully briefed, and no hearing is necessary. For the reasons explained below, the motion will be denied.

## BACKGROUND

### I.   Allegations of the Third Amended Complaint

Relevant allegations of the TAC were set forth in the court's July 31, 2018 Memorandum, but are repeated here for ease of reference. In 2007, Motes was promoted to Chief Operating Officer ("COO") of Albert S. Smyth Co., Inc. ("Smyth Timonium"), a family jewelry business, after a decade at the company. (TAC ¶ 11). Motes's promotion was set out in an Employment Agreement that included the following terms: (1) Motes was granted a 25% interest in all operating entities and in each subsequently established retail subsidiary; (2) his partnership was limited by the "rights, duties and obligations . . . set forth in" each entity's Operating Agreement; (3) Motes was granted a Valuation Bonus to be paid on the termination of his employment; and (4) Smyth would pay him a $600,000 salary, increased by $25,000 yearly. (*Id.* ¶¶ 13–15).[3] As Smyth grew, so too did Motes's 25% interest: Motes took an ownership interest in Smyth Annapolis, LLC and Smyth Ellicott City, LLC in 2008; Smyth Enterprises, LLC in 2009; TheDiamondSupplier.com, LLC in 2011; and Smyth Management Services, LLC in 2012. (*Id.* ¶¶ 16–19). These entities were not all successful, however, and several were closed—Smyth Enterprises, Smyth Management Services, and TheDiamondSupplier.com—between 2014 and 2015. (*Id.* ¶ 22).

---

[3] On a motion to dismiss, the court may consider documents that are integral to the complaint. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016).

According to the Third Amended Complaint, the parties revisited Motes's Employment Agreement in 2009 to more perfectly capture his position as a full partner in the business. The result was a freezing of Motes's Valuation Bonus at $62,302 and a new compensation scheme. Motes would now share Smyth's profits and losses on a consolidated basis. (TAC ¶ 25). Thus, Motes's interest for any year was 25% of all profits less all losses. All of this occurred by oral agreement, however. Smyth alleges that it complied with the new agreements until Motes left the company. (*Id.* ¶ 26). Motes, allegedly, did not.

From 2013 to 2015 Motes took a combined $2,826,100 share of Smyth's profits. But a consolidated accounting of Smyth's finances—one that would reflect the parties' alleged oral modification—entitled Motes to only $336,648 over the same period. (TAC ¶ 39). To properly account for the losses he should have taken, Motes (again) allegedly orally agreed, in September 2016, to transfer his 25% interest in Smyth Annapolis, LLC and Smyth Ellicott City, LLC to Smyth and to forgive a $158,879 loan he gave to Smyth. (*Id.* ¶ 48). Yet, when presented with a written version of the agreement, Motes refused to sign. (*Id.* ¶ 49). Smyth met with Motes again on November 11, 2016, and presented him with an employment severance agreement, which he also refused to sign. (*Id.*). Motes resigned the next day. (*Id.*). He allegedly took more than thirteen employees with him, including John Jackson III. (*Id.* ¶ 50).

The Third Amended Complaint alleges that Motes and Jackson left with "the Companies' confidential records." (TAC ¶ 56). This information represents "the buying habits of over 69,000 customers." (*Id.* ¶ 55). It was protected by a security system, including a password and an Employee Handbook that warned employees not to remove confidential information from company computers or files. (*Id.* ¶¶ 52–53).

3

Starting in April 2015, Jackson began copying the plaintiffs' business information to a Dropbox account he owned. (TAC ¶ 57). Although some folders created in the account were shared with other Smyth employees, most of the data was controlled by Jackson and, according to the Third Amended Complaint, possibly Motes. (*Id.* ¶¶ 59–62). Based on their own "information and belief," Smyth alleges that the copying of their data was part of Motes's and Jackson's plan to start a competing jewelry business. (*Id.* ¶ 64).

Since he left the company, Jackson has repeatedly accessed the files, even after he helped start a competing jewelry business named Meritage Jewelers. (TAC ¶¶ 74–81). Articles of Organization were filed for Meritage in January 2017, (*id.* ¶ 76), and the company opened for business eight months later in August 2017, (*id.* ¶ 83). Jackson is one of three owners. His partners are Jennifer McCullough—allegedly Motes's romantic partner—and Michael Lund. (*Id.* ¶¶ 83–84). Smyth alleges that the defendants have used the business information they copied to support Meritage. (*Id.* ¶ 86).

The Third Amended Complaint contains the following counts: (1) violations of the Defend Trade Secrets Act ("DTSA") (against all defendants); (2) violations of the Maryland Uniform Trade Secrets Act ("MUTSA") (against all defendants); (3) Breach of Contract (against Motes); (4) Breach of Covenants (against Motes); and (5) Breach of Loyalty (against Motes and Jackson).

## II.   The court's July 31, 2018, Memorandum and Order

After the court granted Smyth's leave to file a third amended complaint, (ECF 64, 65), the defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), (ECF 66, 68, 69). In its July 31, 2018, Memorandum, the court addressed each of the five counts alleged in the Third Amended Complaint in turn and found that Smyth failed to adequately

4

allege any claims against Motes. (7/31/18 Memo., ECF 75); *Albert S. Smyth Co. v. Motes*, No. CV CCB-17-677, 2018 WL 3635024 (D. Md. July 31, 2018).[4] First, the DTSA and MUTSA claims against Motes failed because Smyth did not allege, in non-conclusory terms, if or how Motes misappropriated Smyth's business trade secrets. Second, the court engaged in a detailed analysis of Smyth's breach of oral contract claim against Motes. The court found that Smyth proffered no evidence—besides its own conclusory statements—that the oral contract existed, and thus looked to the dealings between the parties to determine whether they behaved in a manner consistent with the existence of the contract. Taking the allegations of the Third Amended Complaint as true, the court found that they did not. As the court explained:

> After the alleged modification of his employment agreement, according to the complaint Motes continued to take his 25% interest on a non-consolidated basis, as he was entitled to under his original employment agreement, and neither he nor Smyth acted as if this were improper. Indeed, Smyth never acted as if a new contract had been formed: specifically, for the three years from 2013 to 2015 it showed no recognition that Motes had not taken a consolidated stake in the companies, costing itself over $2 million. ([TAC] ¶ 39). For a sophisticated company, allegedly against the ropes, this is an implausible oversight. (*See, e.g.*, *id.* at ¶ 35).

(7/31/18 Memo. at 11). The court further found that the allegations regarding the proposed amendments to the Smyth Ellicott City and Smyth Annapolis Operating Agreements cut against their claim that an oral contract existed:

> Smyth did attempt to reach a new agreement with Motes in light of his alleged breach of contract, in which Smyth would forgive what Motes owed the company if Motes agreed to give up his 25% interest in Smyth Annapolis and Smyth Ellicott City. (*Id.* at ¶ 48). And if the parties had reached that agreement, it would lend some support to the plaintiffs' claim. But Motes never did agree to those terms, and resigned soon after they were presented to him. (*Id.* at ¶ 49).

(7/31/18 Memo. at 12). The court thus concluded that Smyth failed to plausibly state a breach of contract claim against Motes.

---

[4] The court also dismissed the claims against Meritage, but for the purposes of this motion, the court will recite its reasoning only with respect to Motes.

5

Third, the court found that the breach of covenants claim against Motes failed because Smyth did not adequately allege that Motes was bound by non-compete and non-solicitation clauses at the time he left Smyth's employ. Fourth and finally, the court found that the breach of the duty of loyalty claim failed because Smyth did not adequately allege that Motes solicited customers or misappropriated business records.

* * *

After the close of discovery, Smyth filed the instant motion. Although Smyth ostensibly seeks reconsideration of the dismissal of all claims against Motes, (Mot. at 4,[5] ECF 111-1), the substance of the motion includes only the breach of contract claim. Accordingly, the court will treat the motion as one seeking reconsideration of only that claim.

**STANDARDS OF REVIEW**

I. **Reconsideration**

Motions for reconsideration of an interlocutory order are governed by Federal Rule of Civil Procedure 54(b), under which "any order . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Accordingly, when appropriate, a district court retains the power to reconsider and modify its interlocutory judgments at any time before final judgment. *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). Resolution of the motion is "committed to the discretion of the district court," *id.* at 515, and "the goal is to reach the correct judgment under law," *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 618 (D. Md. 2013) (citation and quotation marks omitted). "In considering whether to revise interlocutory decisions, district courts in this Circuit have looked to whether movants presented new arguments or

---

[5] Citations to the memorandum in support of the motion to reconsider (ECF 111-1) correspond to internal pagination rather than to page numbers assigned by CM/ECF.

evidence, or whether the court has 'obviously misapprehended a party's position or the facts or applicable law.'" *Id.* at 619–20 (quoting *United States v. Duke Energy Corp.*, 218 F.R.D. 468, 474 (M.D.N.C. 2003) (further citations omitted)). A motion for reconsideration, however, is "not the proper place to relitigate a case after the court has ruled against a party, as mere disagreement with a court's rulings will not support granting such a request." *Lynn,* 953 F. Supp. 2d at 620 (citation and quotation marks omitted).

## II. Leave to amend

Federal Rule of Civil Procedure 15(a) provides that leave to amend should be freely given "when justice so requires." Therefore, "leave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009).

## ANALYSIS

### I. Timeliness of Smyth's motion

As an initial matter, the court considers Motes's argument that the motion for reconsideration is untimely under the District of Maryland's local rules. Pursuant to Local Rule 105.10, a motion for reconsideration of an interlocutory order must be filed no later than fourteen days after the entry of the order. *See* Local Rule 105.10. Local Rule 604, however, allows for the suspension of the provisions of any local rule "for good cause shown." *See* Local Rule 604; *accord Gen. Ins. Co. of Am. v. Walter E. Campbell Co., Inc.*, 241 F. Supp. 3d 578, 584 (D. Md. 2017), *aff'd*, 886 F.3d 346 (4th Cir. 2018).

The court dismissed Smyth's claims against Motes on July 31, 2018, (ECF 75, 76, 78), and this motion was filed over a year later, (ECF 111). But in light of Smyth's assertion that this

7

motion is based on new evidence revealed in discovery, (Mot. at 3–4), the court will not dismiss the motion on timeliness grounds.

## II. Reconsideration based on new evidence

Smyth argues that the court should reconsider its dismissal of the breach of oral contract claim against Motes because discovery material, including deposition testimony and financial documents, confirms that Motes and Smyth orally modified the 2008 Employment Agreement. (Mot. at 4). Motes argues that the discovery material was previously available to Smyth and thus may not be considered on a motion for reconsideration, but that even if the court does consider the material, it does not provide new evidence tending to support the allegation of an oral agreement. (Opp'n at 11–15, ECF 120).

Where a motion to reconsider an interlocutory order is based on "new evidence," the court considers whether the evidence is actually "new" or "previously unobtainable," rather than "merely newly submitted." *See Duke Energy*, 218 F.R.D. at 474. Here, the court agrees that much of the discovery material Smyth presents was not previously unobtainable, as it consists largely of deposition excerpts of current or former Smyth employees and internal financial documents. But the fact that the evidence was not previously unobtainable is not dispositive where, as here, the interlocutory order at issue is a Rule 12(b)(6) dismissal. As the Fourth Circuit explained in *Fayetteville Inv'rs v. Commercial Builders, Inc.*, a district court should not refuse to reconsider a Rule 12(b)(6) dismissal on the grounds that the plaintiff failed to present the supporting evidence at an earlier date, as "it is not the duty of a plaintiff to come forward with the facts of the case as soon as a motion to dismiss is filed and served." 936 F.2d 1462, 1472–73 (4th Cir. 1991). Accordingly, the court will examine the discovery material to determine whether revival of the breach of contract claim is warranted.

The court previously dismissed the breach of contract claim based on its determination that Smyth did not plausibly allege the existence of an oral agreement whereby Motes agreed to take distributions based on Smyth's consolidated profits rather than based on the individual profits of the LLCs. (7/31/18 Memo. at 12). Even with the benefit of discovery, Smyth's claim still fails. While the evidence shows that Smyth leadership (Robert Smyth, Timothy Smyth, and Leonard Getschel) apparently *believed* that Motes had agreed to take distributions based on combined profitability instead of individual company profits, there is no evidence Motes actually made such an agreement, or that the agreement was ever followed. Motes has maintained that he was entitled to 25 percent of profits from each Smyth entity on a *non*-consolidated basis, (*see* Motes Depo. at 29:15–19, 33:6–9, ECF 111-3), which is the arrangement reflected in the LLCs' Operating Agreements. Motes's distributions from the LLCs were in amounts consistent with that arrangement.[6]

Smyth makes much of the fact that the LLCs were more profitable on paper than they actually were, because Smyth Timonium carried certain overhead expenses from those entities on its books. According to Smyth, this means that Motes's distributions from the LLCs were artificially high. But the evidence shows that Smyth itself made the choice to allocate the LLCs' expenses in this way. According to Thomas Moore, Smyth's former outside accountant, Smyth

---

[6] Thomas Moore, Smyth's outside accountant until his retirement in 2013, testified that when he calculated Motes's annual bonus, "Mark would receive a twenty-five percent bonus or a twenty-five percent . . . distributable profit element, bonus or otherwise, of all of the profits of the Smyth Group Enterprises," and that "the Albert S. Smyth Company [] for each of the years I was involved always had a profit," whereas "[f]or the LLCs losses and profits among the different companies . . . was all netted to calculate twenty-five percent of the LLC combined net profitability." (Moore Depo. at 56:6–58:15, ECF 111-4). Moore did not testify that Motes agreed *not* to take distributions based on individual LLC profitability, and indeed admitted that Motes was not paid by "one check cut for the combined profits of all the subsidiaries." (*Id*. at 58:16–18). While Moore did suggest that "something else" replaced the Motes's Employment Agreement, he could not describe with any certainty what the "something else" was. (*Id*. at 53:4–9). And based on Moore's testimony, the "something else" could have simply been the fact that Motes became a 25 percent owner of the LLCs: "once the LLCs came onboard and there was direct ownership that satisfied more of this entrepreneurial need for an executive to be part of the ownership team." (*Id*. at 54:10–17).

9

Timonium consistently paid some of the LLCs' expenses. (Moore Depo. at 196:3–10, ECF 111-4). Against Moore's advice, Smyth's board chose not to allocate those expenses to the LLCs, deciding that allocation would be too "cumbersome." (*Id*. at 141:21–143:10). In Smyth's telling, this allocation choice made no difference in Motes's compensation during profitable years, as the "bloated" distributions Motes took from the LLCs were offset by his proportionally lowered Smyth Timonium distribution. (Mot. at 13–14). But when Smyth Timonium started losing money in 2013, the allocation choice *did* make a difference, as there was no way to "offset" Motes's distributions from the LLCs.

All this proves, however, is that the arrangement between Smyth and Motes was a bad one for the company. Based on the clear language of the LLCs' Operating Agreements, Motes was entitled to 25 percent of each entities' profits. He took his distributions based on the profits reported in the Consolidated Financial Statements, the only contemporaneously created financial statements in the record.[7] The court has been presented with no evidence that Motes was not entitled to do that. Indeed, Smyth has not offered a consistent explanation as to how Motes was *supposed* to calculate his distributions from the LLCs, if not based on the Consolidated Financial Statements. It appears that Smyth did not create standalone financials for the LLCs until 2019, after the commencement of this litigation. (*see* ECF 111-14 at 9 (Report of Smyth's experts)).[8] And Smyth alternates between claiming that the oral agreement superseded or modified the LLC Operating Agreements, (*see, e.g.,* Mot. at 27; R. Smyth Depo. at 42:14–20, ECF 111-5), and

---

[7] Smyth asserts that the Consolidated Financial Statements were created to "describe[] generally the company's financial position, including its subsidiaries . . . in order to meet conditions of various banks over the years." (Mot. at 14; *see also* Moore Depo. at 28:7–14, ECF 111-4).

[8] According to the "list of information reviewed" in the expert report of Michael J. Young and Angela Iannetta, Young and Iannetta reviewed "Independent Accountant Compilation Report and Financial Statements" from 2013–16 for the LLCs, which were created on July 6, 2019. (ECF 111-14 at 9). There is no mention, however, of *contemporaneous* standalone financials for the LLCs. (*Id*.). The court assumes that if these documents existed, Smyth would have given them to its experts.

claiming that the Operating Agreements were not modified, and internally require allocation before distribution, (*see* Reply at 7, ECF 133; *see also infra* Part III). Even assuming, as many of the witnesses apparently did, that Motes was entitled to "25 percent of everything," (*see, e.g.*, Kordonski Depo. at 37:6–9, ECF 111-9), there is not enough evidence to show that Motes's "25 percent of everything" meant that he could no longer take distributions on an individual company basis, as was his typical practice, (*see* Quinn Depo. at 38:13–39:2, ECF 111-15 (it was the "pattern" that Motes's distributions were handled on an "individual company basis," not a consolidated one)).

The lack of contemporaneous, documentary evidence of the alleged oral agreement is also telling. Smyth states in its motion that the "modification and restructuring [of Motes's Employment Agreement] is outlined in a contemporaneous document prepared by a third party," the Report on Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008. (Mot. at 7). But Smyth overstates what this document actually shows. The Consolidated Financial Statement, which contains a short provision about the valuation bonus being frozen and payable upon termination, says nothing about Motes agreeing to no longer take distributions from the LLCs on an individual company basis. (*See* 2008–09 Consolidated Financial Statement, ECF 111-10 at 17). And the board meeting minutes attached to Smyth's motion actually appear to undermine Smyth's claim of an oral agreement. At the April 28, 2016, board meeting, Motes apparently "agreed that cost to run Timonium can be factored in against bloated profits taken from LLC's." (April 28, 2016, Board Minutes, ECF 111-16). But this statement, made in 2016, reads as forward-looking; there is no indication in the minutes that the board considered Motes to be in breach of an oral agreement. (*See id.*).[9]

---

[9] The minutes of the September 15, 2016, board meeting mention a "debt" Motes owes to Smyth, but does not mention a breached agreement or provide any details about what comprised this "debt." (September 15, 2016, Board

The court understands that Smyth identifies as a "casual" family business "built on trust." (Mot. at 24). The statements of Smyth's members about the alleged oral agreement with Motes echo this sentiment. Timothy Smyth stated that "we had a lot of casual agreements trying to accommodate Mark's desire to feel like he was owner." (T. Smyth Depo. at 71:4–13, ECF 111-7). Elaborating on his understanding of any oral agreements with Motes, T. Smyth stated, "Usually, an oral agreement is a legal term, I imagine. To me, an oral agreement is a casual discussion between businessmen that protect -- that trust each other that this was the way we're running the business." (*Id*. at 84:21–85:4). The following exchange from Leonard Getschel's deposition is particularly illuminating:

> Q: Mr. Getschel, we have talked quite a lot this morning about an oral agreement to consolidate the profits and losses of the different entities, correct?
>
> A: It was more like a statement by Mark Motes, not an oral agreement. We did not sit down and discuss it. It was I am in for the winnings and I am in for the losses. I am a partner.

(Getschel Depo. at 81:14–20, ECF 111-6). Any agreement with Motes was apparently so casual that even R. Smyth, who claimed to have entered the agreement on behalf of the company, (*see* R. Smyth Depo. at 37:5–18, ECF 111-5), was unable to recall key details about the agreement, like when it was finalized, (*id*. at 35:12–14, 37:19–38:11, 45:7–9), or in what years it was followed, (*id*. at 49:11–21). Indeed, Smyth's corporate representative, Robert Yanega, admitted at his deposition that he did not "have a specific date or a time," for when the oral agreement was entered into, nor could he recall the year. (Smyth Corp. Depo. at 51:16–52:1, ECF 111-8). "[A]n enforceable contract must express with definiteness and certainty the nature and extent of the

---

Minutes, ECF 111-17). This could reference the alleged oral agreement made in September 2016, (see TAC ¶ 48), but, as alleged in the Third Amended Complaint, Motes refused to sign a written version of this agreement, (*id*. ¶ 49). As the court reasoned in its July 31, 2018, Memorandum, this suggests that an agreement was never actually reached.

12

parties' obligations." *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc*., 178 Md. App. 328, 377 (2008). Here, even with the benefit of discovery, there is simply not enough evidence to establish the existence of an enforceable oral agreement.

### III. Reconsideration based on new breach of contract theory

In addition to arguing that new evidence warrants reconsideration of the court's dismissal of the breach of contract claim, Smyth appears to advance a novel legal argument: that Motes's taking of distributions on an individual company basis violated not only an oral agreement, but also the express requirements of the LLCs' Operating Agreements. In so arguing, Smyth relies on Section 8.2 of the Operating Agreements, which "require that the LLC's books and records be kept in accordance with 'sound accounting principles[.]'" (Mot. at 27). According to Smyth, the import of this provision is that before distributions could be paid, Motes was required to proportionately allocate expenses shared by all the entities. (Mot. at 27–30). Such proportionate allocation would have resulted in lower profits for Smyth Ellicott City and Smyth Annapolis, because Smyth Timonium had historically carried overhead expenses for those entities on its books. Accordingly, argues Smyth, Motes overpaid himself in distributions in violation of the Operating Agreements. (*Id*.).

This new breach of contract theory, however, does not appear in the Third Amended Complaint. There, Smyth's breach of contract claim consists entirely of the following allegations: (1) in 2009, Motes orally agreed to take a consolidated stake in all Smyth entities, (TAC ¶¶ 102–04); (2) Section 4.1 of the Smyth Ellicott City and Smyth Annapolis Operating Agreements mandated that profits and losses from "each LLC" were to be allocated to the interest holder in proportion to their percentage interests, (*id*. ¶ 107); (3) the oral agreement required Motes to net Smyth Timonium's losses against the profits from Smyth Ellicott City and

13

Smyth Annapolis, (*id*. ¶ 108); and (4) by failing to adhere to the provisions of the oral agreement, Motes overpaid himself almost $2 million in distributions, (*id*. ¶ 114).

The breach of contract claim—in which Smyth seeks damages in the amount of the allegedly excessive distributions Motes paid to himself—hinges on the existence of an oral agreement. The only written contractual provisions Smyth references are Sections 4.1 of the Operating Agreements, which Smyth claims require the sharing of profits and losses of Smyth entities on a consolidated basis. As an initial matter, the court notes that Section 4.1 actually describes distributions based on cash flow, while Section 4.2 describes "allocations" based on profits or losses. But regardless, both Sections 4.1 and 4.2 provide for payouts to members based on financials from "the Company," which is internally defined in each Operating Statement as "the limited liability company organized in accordance with this Agreement," (i.e., either Smyth Ellicott City or Smyth Annapolis). The Operating Agreements, then, cannot support Smyth's claim that Motes impermissibly paid himself distributions based on non-consolidated financials *unless* Smyth can show the existence of the oral agreement modifying Motes's entitlement to distributions from the LLCs.

Smyth has confirmed several times throughout this litigation its position that the Operating Agreements were modified by the oral agreement, and that it is the oral modification that gives rise to the breach of contract claim. (*See, e.g*., Smyth Corp. Depo. at 43:1–18, ECF 111-8 (Operating Agreement does not reflect "this notion of consolidating of the profits and losses of all the entities," but the oral agreement modified it)). Most recently, in the second motion for reconsideration, Smyth stated that "the oral agreement was entered into after the execution of the operating agreements, and thus modifies those agreements." (Mot. at 27).

14

In its Reply, Smyth attempts to argue that this new breach of contract claim is not new, and that "Smyth has never claimed that the Operating Agreements were modified." (Reply at 7, ECF 133). These statements are flatly contradicted by the record. The Third Amended Complaint does not contain the allegation that Smyth's failure to allocate expenses led to his overpayment of distributions to himself; according to the complaint, it was the failure to make distributions to himself on a *consolidated* basis that led to the breach of contract. And it is a startling shift in position for Smyth to claim in its Reply that it "never claimed that the Operating Agreements were modified," considering that in the second motion for reconsideration itself, Smyth states that "the oral agreement was entered into after the execution of the operating agreements, and thus modifies those agreements." (Mot. at 27).[10]

If Smyth believed it had two breach of contract claims against Motes—one based on the oral agreement, and one based on the un-modified language of the Operating Agreements—Smyth should have brought the additional claim in the Third Amended Complaint. Smyth offers no explanation as to why its interpretation of Section 8.2 of the Operating Agreements appears, for the first time, in the second motion for reconsideration. "[A] party who fails to present his strongest case in the first instance generally has no right to raise new theories or arguments in a motion to reconsider an interlocutory order." *See McLaurin v. E. Jordan Iron Works, Inc.*, 666 F. Supp. 2d 590, 596 (E.D.N.C. 2009), *aff'd*, 410 F. App'x 630 (4th Cir. 2011) (citations and quotation marks omitted). Accordingly, the court will not reconsider its dismissal of Smyth's claims against Motes based on this novel argument.

---

[10] The testimony of Smyth owners and employees also highlights this change in position. (*See, e.g.*, R. Smyth Depo. at 42:14–20, ECF 111-5 (the oral agreement "superseded" the Operating Agreements)).

**IV.     Leave to amend**

As an alternative to reconsideration, Smyth asks the court for leave to amend its complaint. Because Smyth does not submit a proposed amended pleading, as required by Local Rule 103.6(a), the court is not clear on what Smyth proposes to add to its complaint, which is now in its fourth iteration. As the court explained in Part II, *supra*, there is insufficient evidence to support the existence of the alleged oral agreement with Motes. To the extent that Smyth seeks amendment simply to re-allege the breach of oral contract claim, amendment would be futile.

The arguments advanced in Smyth's motion, however, suggest that Smyth may seek amendment in order to allege the new breach of contract theory discussed in Part III, *supra*. If that is the case, the court will nonetheless deny leave to amend on prejudice grounds. As the Fourth Circuit has explained, "whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing," and although "delay alone is an insufficient reason to deny a motion to amend," significant delay increases the likelihood of prejudice to the defendant. *See Matrix Capital*, 576 F.3d at 193 (citations, quotation marks, and brackets omitted). Indeed, "a prejudicial amendment [is one that] raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party [and is] offered shortly before or during trial." *See Equal Rights Ctr. v. Archstone Smith Tr.*, 603 F. Supp. 2d 814, 818 (D. Md. 2009), *aff'd*, 602 F.3d 597 (4th Cir. 2010) (citations and quotation marks omitted).

Here, the potential prejudice to Motes is clear. Discovery has already concluded, and although Smyth asserts that "no additional discovery is necessary" for it to pursue a breach of contract claim against Motes, (Reply at 16), Motes disagrees, noting that "[t]he parties did not conduct full and complete discovery" on claims dismissed prior to discovery, (Opp'n at 22–23).

Moreover, any proposed amendment re-adding Motes as a defendant in this action would "change the nature of the litigation," thus prejudicing Motes. *See Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 604 (4th Cir. 2010). For well over a year, and for the entirety of discovery, Motes has participated in this case as only a counterclaimant. Any amendment that would again place Motes on the defensive would be obviously prejudicial. *See Archstone Smith*, 603 F. Supp. 2d at 818–19 (an "eleventh hour change in litigation theory" prejudiced the defendant's "ability to assess rationally its exposure to a damages award" in favor of the plaintiff). Accordingly, the court will deny Smyth's request to amend its complaint.

## CONCLUSION

For the foregoing reasons, Smyth's motion to reconsider or, in the alternative, to amend the complaint will be denied. A separate order follows.

\_\_\_8/3/20_____ _____/S/_____
Date                                                                                     Catherine C. Blake
                                                                                         United States District Judge