**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ALBERT S. SMYTH CO., INC., *et al.* *
*
v. * Civil No. CCB-17-677
*
MARK A. MOTES, *et al.* *
*
* * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM**

The plaintiffs, Albert S. Smyth Co., Inc.; Smyth Ellicott City, LLC; Smyth Annapolis, LLC; Smyth Management Services, LLC; Smyth Enterprises, LLC; and TheDiamondSupplier.com (collectively "Smyth"),[1] sued Mark A. Motes; John Jackson, III; and Meritage Fine Jewelers ("Meritage") for violations of (1) the Defend Trade Secrets Act ("DTSA") (all defendants) and (2) the Maryland Uniform Trade Secrets Act ("MUTSA") (all defendants), as well as for (3) Breach of Contract (Motes), (4) Breach of Covenants (Motes), and (5) Breach of Loyalty (Motes and Jackson). (*See* Third Amended Complaint ("TAC"), ECF 65).[2] On July 31, 2018, the court granted Jackson's motion to dismiss as to the breach of loyalty claim, but denied the motion as to the DTSA and MUTSA claims. (ECF 75, 78).[3]

In the remaining claims against Jackson, Smyth alleges that Jackson violated both the DTSA and the MUTSA by misappropriating Smyth Timonium's trade secrets, specifically customer data, employee information, business plans, and vendor information. (TAC ¶¶ 88, 99).

[1] Smyth alternates between listing "TheDiamondStore.com" and "TheDiamondSupplier.com" as plaintiffs in this action. (*Compare* Third Amended Complaint ("TAC"), ECF 65 *with* Plaintiffs' First Motion to Reconsider, ECF 81). It is unclear whether these refer to the same entity. Smyth also alternates between filing motions on behalf of all the plaintiffs and on behalf of just a subset of them. (*Compare* Motion to Reconsider, ECF 81 *with* Opposition to Defendant John Jackson's Motion for Summary Judgment, ECF 119). For the purposes of this motion, however, the court need not resolve whether these inconsistencies are deliberate choices or simply errors.

[2] Motes filed a counterclaim against Smyth Ellicott City, LLC and Smyth Annapolis, LLC (collectively "the LLCs"), alleging breach of contract claims. (ECF 52).

[3] The court issued its original Order on July 31, 2018, (ECF 76), which also dismissed all of Smyth's claims against Motes and Meritage. On August 3, 2018, however, the court issued an Amended Order clarifying that although all claims against Motes were dismissed, Motes remained in the case as a counterclaimant, (ECF 78).

Discovery in this matter is now complete. Now pending is Jackson's motion for summary judgment on the remaining claims against him. (ECF 115). The motion is fully briefed, and no hearing is necessary. For the reasons explained below, the motion will be granted.

**BACKGROUND**

The parties have a lengthy history, and the court recites the minimum facts necessary to resolve the pending motion. Jackson, the former Vice President for Operations of Albert S. Smyth Co., Inc. ("Smyth Timonium"), created a Dropbox account in 2010 or 2012 in connection with his work at Smyth Timonium (the "Dropbox Account"). (*See* Jackson Depo. at 18:17–19:8, 21:2–11, ECF 115-3). Jackson used the Dropbox account to share company information with others at Smyth Timonium. (*See id*. at 21:12–22:19, 26:1–4 ("In the drop box [sic], there were many, many shared folders with various people . . . it was shared with several people.")).

In or around June 2013, Jackson changed the email address associated with the Dropbox Account from his Smyth Timonium email address to his personal email address. (Jackson Depo. at 23:2–4, ECF 115-3). This change of email address corresponds to a May 2013 upgrade of the Dropbox Account. (*See* Expert Report of James Scarazzo at 5, ECF 115-10 (citing the Dropbox Account payment history)).[4] Other employees at Smyth Timonium, however, did not realize that Jackson had changed the email associated with the Dropbox Account. (*See* Deposition of Robert Yanega in his individual capacity ("Yanega Depo.") at 215:2–16, ECF 115-4).

At the time Jackson changed the email address associated with the Dropbox Account, Smyth Timonium did not have a policy prohibiting the use of personal email addresses in connection with Smyth Timonium-related Dropbox accounts. (*See* Yanega Depo. at 216:1–13,

[4] Jackson testified that he changed the email address because, after forgetting his password and going through the process of resetting the password, he became concerned about the security risk of continuing to use the original email address. (Jackson Depo. at 26:18–27:4, ECF 115-3).

ECF 115-4 (noting that Smyth Timonium instituted such a policy in 2017)). Smyth Timonium did, however, have a "document policy" that provided, *inter alia*, that "when an employee leaves the Albert S. Smyth Company, the employee must return to the Company all Albert S. Smyth Company related information and property, including originals and copies, that the employee has in his/her possession[.]" (Employee Handbook at 41, ECF 119-12).

Jackson left Smyth Timonium's employ in November 2016, and began working with Motes at a new jewelry store, Meritage, in January 2017. (*See* Jackson Depo. at 8:4–10, 35:9–13, ECF 115-3). Valerie Kordonski, another former Smyth Timonium employee, also went to work for Meritage in April 2017. (Kordonski Depo. at 10:19–21, ECF 119-3). Upon leaving Smyth Timonium, Jackson knew not to "take books or anything like that," but he retained the ability to access Smyth Timonium data via the Dropbox Account. (*See* Jackson Depo. at 27:14–28:19, ECF 115-3). Jackson continued to have access until after the instant lawsuit was filed in 2017. (*Id*. at 28:5–29:17). The Smyth Timonium data Jackson retained access to was in "49 folders, 603 subfolders, 4.8 gigabytes of data, and 10,323 files which together represented virtually all of the business records of the Smyth entities." (Opp'n at 13–14, ECF 119). Among the Smyth Timonium information in the Dropbox Account were three customer lists (the "Customer Lists"). (Deposition of William C. Foote at 40:20–41:10, ECF 119-10). The Customer Lists contained information about Smyth Timonium customers, including names, addresses, phone numbers, date of last purchase, and average sale amount. (*Id*. at 41:11–42:12). The Lists were organized into "gold," "silver," and "platinum," based on total sales for that particular customer relationship. (*Id*. at 42:13–19). The record indicates that the Customer Lists were in three spreadsheets: Customer Levels.xlsx, Customer Levels V2.xlsx, and Customer Levels V3.xlsx.[5]

---

[5] In Scarazzo's expert report, he names these three spreadsheets as the documents he examined in connection with Smyth's claim that Jackson misappropriated the Customer Lists. (Scarazzo Report at 6–7, ECF 115-

These spreadsheets were in a folder in the Dropbox Account named "ITShare." (Deposition of Robert Yanega in his capacity as Smyth Timonium's Corporate Designee ("Smyth Corp. Depo.") at 283:2–284:10, ECF 115-5). ITShare was a shared folder on the Dropbox Account, and several Smyth Timonium employees had access to it. (*Id*. at 284:2–14).

At some point after Jackson left Smyth Timonium, the company realized that Jackson still had access to Smyth Timonium information via the shared folders in the Dropbox Account. (*See* Deposition of Leonard Getschel at 90:2–4, ECF 115-8 ("I know some time had passed from when [Jackson] left and we somehow discovered that he had our drop box [sic] with all of our information in it")). Around the same time, in early 2017, Smyth Timonium came to believe that Meritage was soliciting its customers. (Smyth Corp. Depo. at 275:5–12, ECF 115-5). Smyth Timonium did not know who was contacting the customers, (*id*. at 275:18–20), but suspected Jackson because "he had the customer lists that were in that folder," (*id*. at 275:5–12). According to Smyth Timonium's corporate designee, "[Jackson] was sued because he had our information and hadn't given it back," and the company was concerned that Jackson would use that information in connection with Meritage. (*Id*. at 276:5–9).

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party*

10). He examined no other files in connection with this claim. (*See id*.). Although Smyth takes issue with various aspects of Scarazzo's examination method, Smyth does not assert that Scarazzo examined the wrong documents, or otherwise allege that the Customer Lists existed elsewhere in the Dropbox Account. The court cannot compare the documents Scarazzo examined with the documents R. Christopher Rosenthal (Smyth's damages expert) examined, as Smyth does not include the portion of Rosenthal's report that states which documents he examined. (*See generally* Rosenthal Report Excerpt, ECF 119-11).

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48 (emphasis in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (citations omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

Smyth's DTSA and MUTSA claims center on the allegation that Jackson misappropriated Smyth Timonium's trade secrets, specifically customer data, employee information, business plans, and vendor information. (TAC ¶¶ 88, 99). Jackson argues that he is entitled to summary judgment on both claims because the alleged trade secrets are not *actually* trade secrets within the meaning of the DTSA or the MUTSA, and because there is no evidence that he misappropriated any of this information.

### A. Employee information, business plans, and vendor information

Jackson first argues that, with the exception of the three Customer Lists, none of the alleged trade secrets are identified in sufficient particularity to support DTSA and MUTSA claims. It is axiomatic that a plaintiff asserting a misappropriation of trade secrets claim must

identify the alleged trade secrets with sufficient precision. *See Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993) (in the context of a MUTSA claim, a plaintiff must identify, with particularity, each trade secret it claims the defendant misappropriated); *accord Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 1796293, at *7 (E.D. Va. Apr. 16, 2018) (applying the *Trandes* particularity requirement to a DTSA claim, and citing cases);[6] *see also Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas . . . and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets."). Beyond showing that information "could qualify as trade secrets," a plaintiff still must "produc[e] *some* evidence that [the information] me[ets] the definition of a trade secret." *See Trandes*, 996 F.2d at 661 (emphasis in original).

In its opposition to Jackson's motion for summary judgment, Smyth states that "Mr. Jackson, in Dropbox parlance, owned 49 folders, 603 subfolders, 4.8 gigabytes of data, and 10,323 files which together represented virtually all of the business records of the Smyth entities," and that "the folders, files, documents, individually and as compiled, constitute protected trade secrets." (Opp'n at 13–14, ECF 119). It thus appears to be Smyth's position that all 10,323 files—which, in Smyth's telling, represents "virtually all of the business records" of the company—are trade secrets. While it is, of course, *possible* that "virtually all of the business records" of Smyth Timonium could constitute trade secrets, this strains credulity. But even accepting Smyth's position, for the reasons explained below, Smyth provides insufficient evidence to prove that any of this information (except for the Customer Lists) meets the definition of a trade secret.

---

[6] Unpublished opinions are cited for the persuasiveness of their reasoning, rather than for any precedential value.

As an initial matter, the court observes that Smyth fails to produce any documents found in the 49 folders that allegedly contain trade secrets.[7] Smyth states that it has "review[ed] the files," (Opp'n at 14, ECF 119), but attaches to its opposition a list only of the names of the 49 folders at issue. (*See* List of Smyth Folders, ECF 119-7 (attached to an August 2, 2017, letter from Jackson's counsel to Smyth's counsel)). The names of these folders (e.g., "Dropbox\BBB"; "Dropbox\Holiday2013"; "Dropbox\Mihir") offer limited insight into their contents. (*See id*.). In the few instances Smyth does discuss the contents of a particular folder, it does not explain why the contents should be considered trade secrets. For example, Smyth states that a folder named "MarkJohnSmyth" contains spreadsheets on "2016 budgets, revenue and expenses, and payroll information," and argues that such documents could not have been "irrelevant" to Jackson's plans of opening a competing store. (Opp'n at 16, ECF 119). Smyth, however, does not explain how this information constitutes trade secrets. *Cf. Optic Graphics, Inc. v. Agee*, 87 Md. App. 770, 787–88 (1991) (information that could qualify as a trade secret (pricing information) nonetheless was not a trade secret because the information was "specific to" the company from which it was allegedly misappropriated). Moreover, simply providing the court with the names of particular files does not sufficiently demonstrate that the contents of those files are trade secrets. *See Fyfe Co., LLC v. Structural Grp., Inc.*, No. CV CCB-13-176, 2016 WL 4662333, at *8 (D. Md. Sept. 7, 2016) ("[A]lthough a number of file names could be considered descriptive to the extent that they include words such as 'proposal' or 'budget' . . . plaintiffs have proposed no way for this court to determine whether any of the files actually are in fact proposals or budgets containing trade secret information.").

---

[7] Based on the excerpt from R. Christopher Rosenthal's expert report attached to Smyth's Opposition, it appears that Rosenthal reviewed three customer lists: the "Silver," "Gold," and "Platinum" lists. (Rosenthal Report Excerpt, ECF 119-11 at 4). As Jackson does not contest that the Customer Lists are sufficiently identified, the court does not take issue with Smyth's failure to produce the actual lists.

The court acknowledges that in the July 31, 2018, Memorandum, it found that Smyth had adequately alleged that the employee information, business plans, and vendor information constituted trade secrets within the meaning of the DTSA and the MUTSA. (July 31, 2018, Memo. at 6–7, ECF 75). But, contrary to Smyth's suggestion, this does not mean that the claims must survive summary judgment. (*See* Opp'n at 14, ECF 119). The court's prior finding was in the context of a motion to dismiss, where the court accepts a plaintiff's factual allegations as true, and a plaintiff is not yet required to provide evidentiary support for asserted claims. By contrast, at the summary judgment stage, the court must evaluate the record and prevent factually unsupported claims from proceeding to trial. *See Bouchat*, 346 F.3d at 526. Here, because only the Customer Lists are sufficiently identified as trade secrets, the record does not support DTSA and MUTSA claims based on any other allegedly misappropriated information. Jackson is thus entitled to summary judgment on the DTSA and MUTSA claims as to allegedly misappropriated employee information, business plans, and vendor information.

**B. Customer Lists**

Jackson does not appear to contest that the Customer Lists qualify as "trade secrets" within the meaning of the DTSA and the MUTSA.[8] Nevertheless, he argues that the court should

[8] Under the DTSA, the following information may qualify as a "trade secret": "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing[.]" 18 U.S.C. § 1839(3). However, "such information only becomes a trade secret if (1) the owner of the trade secret takes 'reasonable measures to keep such information secret,' and (2) the information 'derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information.'" *Brightview Grp., LP v. Teeters*, --- F. Supp. 3d ----, 2020 WL 978665, at *8 (D. Md. Feb. 28, 2020) (quoting 18 U.S.C. § 1839(3)(A)–(B)).

Similarly, under the MUTSA, a "trade secret" may be "any information that the owner '[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use,' and takes reasonable efforts to maintain its secrecy." *Id*. at 9 (quoting Md. Code Ann., Com. Law § 11-1201(e)).

grant summary judgment in his favor because there is insufficient evidence that he misappropriated the Customer Lists.

Under the DTSA, "a trade secret can be misappropriated when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means . . . or (2) uses or discloses the trade secret after acquiring it through improper means." *Brightview Grp., LP v. Teeters*, --- F. Supp. 3d ----, 2020 WL 978665, at *11 (D. Md. Feb. 28, 2020) (citing 18 U.S.C. § 1839(5)(A) and (B)(i)). "Maryland defines misappropriation in 'substantially the same manner.'" *See id*. (quoting *Md. Physician's Edge, LLC v. Behram*, No. DKC-17-2756, 2019 WL 4573417, at *5 (D. Md. Sept. 20, 2019)). "Improper means" includes "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); Md. Code Ann., Com. Law § 11-1201(b).

Smyth argues Jackson misappropriated Smyth Timonium's trade secrets in two ways: (1) by "tak[ing] the information with him when he left" (i.e., retaining access to the Dropbox Account), (Opp'n at 16–19, ECF 119); and (2) by using and disclosing the information, (*id*. at 19–21). With respect to the first alleged method of misappropriation, the court disagrees that Jackson's mere ability to access the Customer Lists constitutes misappropriation. In *Diamond v. T. Rowe Price Assocs., Inc*., the court found that an employee's refusal to return company documents after she ceased working for the company did not constitute misappropriation of trade secrets where "the vast majority [of the documents] had been maintained in [the employee's] home office, with the full knowledge and approval of T. Rowe Price, over the course of years," and there was "no showing that [the employee] ever misused the files or the information therein[.]" 852 F. Supp. 372, 409 (D. Md. 1994). Here, Smyth concedes that it was not improper

for Jackson to have access to all of Smyth Timonium's data while employed by the company. (Smyth Corp. Depo. at 262:16–19, ECF 115-5). Even assuming that Jackson's retention of access to the Customer Lists violated Smyth Timonium's document policy, (*see* Employee Handbook at 41, ECF 119-12), this alone does not amount to misappropriation within the meaning of the DTSA and the MUTSA. *See Diamond*, 852 F. Supp. at 409 (misappropriation requires more than a showing that "the nominal 'owner' of the documents . . . was entitled to their return").

Smyth's second alleged method of misappropriation—that Jackson used and disclosed the Customer Lists in order to set up a competing business—also fails, because the record is devoid of evidence that Jackson accessed the Customer Lists after leaving Smyth Timonium. Indeed, the only evidence in the record pertaining to whether Jackson accessed the Customer Lists after terminating his employment comes from James Scarazzo, an expert from FTI Consulting Technology, Inc. hired by Jackson to conduct a forensic examination of the Dropbox Account. (Scarazzo Report at 1, ECF 115-10). According to Scarazzo's examination of "the activities associated with the Customer Level spreadsheets," recorded in each file's metadata, the Customer Lists ("Customer Levels.xlsx," "Customer Levels V2.xlsx," and "Customer Levels V3.xlsx") were last accessed in June 2016. (*Id*. at 6–7). Scarazzo concluded that "[t]he evidence shows that Jackson did not access or use the Customer Level spreadsheets after he left Smyth's employ." (*Id*. at 7).

While Smyth takes issue with various aspects of Scarazzo's examination of the Dropbox Account, it does not specifically dispute Scarazzo's finding that the metadata recorded Jackson's last access to the Customer Lists in June 2016. (Opp'n at 8–12, 19–22, ECF 119). Rather, Smyth lists hypothetical ways Jackson could have "accessed" the Customer Lists without leaving

metadata evidence (e.g., by copying them to another location or placing them on an external hard drive), and suggests that Scarazzo's conclusions cannot be relied upon because he did not rule out these possibilities. (*Id*. at 10, 20–21). It thus appears to be Smyth's position that because Jackson has not conclusively proven that he did not misappropriate the Customer Lists, he is not entitled to summary judgment. This is not quite right. Rather, Jackson is entitled to summary judgment if the claims against him are not supported by evidence. Here, there is no *evidence* that Jackson engaged in any of the hypothetical methods of "accessing" the Customer Lists without leaving a metadata footprint, only Smyth's continued conjecture.

Tellingly, Smyth did not hire its own expert to fill in perceived holes in Scarazzo's report. Smyth argues that because "Mr. Jackson, Ms. Kordonski, and Mr. Scarazzo all concede that the trade secrets have been used," "it is obvious that no expert is required." (Opp'n at 19–20, ECF 119). First, this is not an accurate characterization of the testimony in this case. Jackson did state that "[he] would have shared [Dropbox data] with Val [Kordonski] and the information to get our licenses and plans. We had to set up the accounting system. I would have set up a folder for her." (Jackson Depo. at 35:21–36:6, ECF 119-2). Jackson does not specify which Dropbox data he "would have shared," or even whether that data included Smyth Timonium information. (*See id*.). Even construing this statement in the light most favorable to Smyth—interpreting it as an admission that Jackson shared Smyth Timonium accounting and business plan information with Kordonski—this statement says nothing with respect to the Customer Lists, which are the relevant documents here. Kordonski testified that when she left Smyth Timonium, "spreadsheets and stuff like that, all work-related to Smyth" remained in her personal Dropbox, that she "did not do anything" with the data, and that she "might have" looked at the data at some point to disaggregate Smyth Timonium data from her personal data. (Kordonski Depo. at 42:15–44:4,

ECF 119-3). This testimony is not at all probative of whether Jackson improperly gave Kordonski access to the Customer Lists after he left Smyth Timonium. And while Scarazzo did agree that the "Mark John Smyth folder was accessed by John Jackson in January of 2017," (Scarazzo Depo. at 11:18–21, ECF 119-4), Jackson's access to this folder—which allegedly "contains . . . data relating to the plan to formally merge Smyth Annapolis, Smyth Ellicott City and Albert Smyth & Co. into a single entity," (TAC ¶ 75, ECF 65)—is irrelevant to whether Jackson accessed the Customer Lists, which Smyth claims were in a different folder, titled "ITShare," (*id*. ¶ 81).[9]

Second, it is not "obvious that no expert is required." Of course, if Smyth had any other evidence that Jackson accessed or otherwise misappropriated the Customer Lists, Smyth would not necessarily need an expert to rebut Scarazzo's report in order to survive summary judgment. But Smyth has presented no evidence. It simply critiques Scarazzo's report and repeats its belief that Jackson *somehow* accessed the Customer Lists. The court, however, cannot construe the absence of conclusive proof of Jackson's innocence as evidence of his guilt. As Smyth's claims that Jackson misappropriated the Customer Lists are unsupported by the record, Jackson is entitled to summary judgment.

**CONCLUSION**

For the foregoing reasons, Jackson's motion for summary judgment (ECF 115) will be granted. A separate order follows.

8/3/20
Date

/S/
Catherine C. Blake
United States District Judge

[9] The court notes that Scarazzo further testified that "the folders underneath [the Mark John Smyth folder] were not accessed. . . . [T]he files themselves were not accessed." (Scarazzo Depo. at 12:7–10, ECF 119-4).